TROPPI *v.* SCARF

1. NEGLIGENCE—PHARMACISTS—STANDARD OF CARE—LIABILITY.

A pharmacist is held to a very high standard of care in filling prescriptions; a pharmacist is liable for the harm resulting to a purchaser when he negligently supplies a drug other than the one requested.

2. NEGLIGENCE—PREGNANCY—BIRTH CONTROL PILLS—COMPENSABLE LOSS.

Plaintiffs' complaint for damages as a result of plaintiff wife's becoming pregnant caused by defendant pharmacist's incorrectly filling an order for birth control pills stated a claim on which relief could be granted because pregnancy, for purposes of determining the correctness of a summary judgment, was a foreseeable consequence of the defendant's negligence, and money expended on medical care, loss of wages during pregnancy, and pain and suffering, as that in childbirth, are compensable injuries.

3. NEGLIGENCE—DAMAGES—EXTENT OF LIABILITY.

The general rule of damages in an action for tort is that the wrongdoer is liable for all injuries resulting directly from the wrongful acts, whether foreseeable by him or not, provided they are the legal and natural consequences of the defendant's wrongful act and, according to common experience, might reasonably have been anticipated.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 6] 25 Am Jur 2d, Drugs, Narcotics, and Poisons §§ 54–57, 60, 61. Liability of druggist for injury in consequence of mistake. 44 ALR 1482.

[1] 28 Am Jur, Negligence §§ 29–42.

[2, 4] 12 Am Jur 2d, Birth Control §§ 2–5.

[2, 4, 5, 8–16] Tort liability for wrongfully causing one to be born. 22 ALR3d 1441.

[3] 38 Am Jur, Negligence §§ 104–108.

[5] 12 Am Jur 2d, Birth Control §§ 4–6.

[7–16] 52 Am Jur 2d, Torts §§ 10–17.

4. HEALTH—CONTRACEPTIVES—POLICY.

Trial court's statement that to allow damages for the birth of a child following a pharmacist's negligence in filling a prescription for birth-control pills is in contravention of public policy does not express the manifest will of the people where the legislature has recently enacted two separate statutes designed to foster the use of contraceptives and where hundreds of thousands of persons use contraceptives daily, thus expressing the sense of the community.

5. CONSTITUTIONAL LAW—CONTRACEPTIVES—NEGLIGENCE ACTION—BARRING SUITS.

The State, not being able to infringe upon the rights of a husband and wife to use contraceptives to limit the size of their family, may not negate these rights by completely denying access to the courts to sue for a pharmacist's negligence in filling an order for birth control pills.

6. NEGLIGENCE—PHARMACISTS—PUBLIC POLICY.

Public policy favors a tort scheme which encourages pharmacists to exercise great care in filling prescriptions.

7. NEGLIGENCE—DAMAGES—BENEFITS RULE.

The value of a benefit conferred upon a plaintiff or his property by a tortfeasor is considered, where equitable, in mitigation of damages where the tortious conduct confers both a harm and a special benefit to the same interest harmed.

8. NEGLIGENCE—UNPLANNED CHILD—DAMAGES—BENEFITS RULE.

The benefits of an unplanned child may be weighed against all the elements of claimed damage resulting from the unplanned child, which include the anxiety, incapacity, and pain and suffering inextricably related to child bearing.

9. NEGLIGENCE—UNWANTED CHILD—DAMAGES—BENEFITS RULE.

The benefits rule, allowing a special benefit conferred on the plaintiff by the tortfeasor's conduct that produced the harm complained of to be considered in reducing damages, does not preclude as a matter of law recovery for damages for the birth of an unwanted child; the services and companionship of an unwanted child do not always have a dollar value equivalent or greater than the economic costs of the child's support, and the restrictions and pain and suffering caused by pregnancy and the obligation to rear the child.

10. NEGLIGENCE — UNWANTED CHILD — DAMAGES — BENEFITS — QUESTION OF FACT.

   The benefits conferred on the parents of an unwanted or unplanned child is a question for the trier of fact; factors to be considered include family size, family income, and age of the parents.

11. NEGLIGENCE—UNWANTED CHILD—DAMAGES—MITIGATION—ADOPTION—REASONABLENESS.

   Parents who seek to recover damages for the birth of an unwanted child are not under a duty to mitigate damages by placing the child for adoption, because the doctrine which requires a plaintiff to take measures to minimize the financial consequences of a defendant's negligence requires only that reasonable measures be taken.

12. NEGLIGENCE — REASONABLENESS — STANDARDS — PLAINTIFF'S CONDUCT.

   The standard used to judge the reasonableness of the acts of a plaintiff after an injury has occurred is less stringent than the standard used to judge the tortious conduct itself.

13. NEGLIGENCE — UNWANTED CHILD — DAMAGES — MITIGATION — CHILD'S BEST INTERESTS.

   The best interests of the child must be considered in determining the reasonableness of actions of the parents plaintiffs in a suit for damages for the birth of an unwanted child, in mitigating damages; the law recognizes the desirability of a child being reared by his natural parents.

14. PARENT AND CHILD—MOTHER'S RIGHTS—UNWANTED CHILD.

   A child will not be taken from his mother without her consent, without regard to whether the child was conceived or born in wedlock, unless the child is neglected or the mother is unfit; a mother's right to keep her child is not dependent on whether she desired the conception of the child.

15. NEGLIGENCE—UNWANTED CHILD—DAMAGES—MITIGATION—ABORTION—ADOPTION.

   A tortfeasor whose negligence results in the conception and birth of an unwanted child has no right to insist upon the mother's aborting or placing the child for adoption in order to mitigate damages, because the tortfeasor takes the injured party as he finds her and cannot complain that the damages he will be assessed are greater than those which would have been determined if the plaintiff were willing to abort or place the child for adoption.

16. DAMAGES — MITIGATION — UNWANTED CHILD — ABORTION — ADOPTION.

> A plaintiff, wed or unwed, suing for damages resulting from the birth of an unwanted child caused by the tortfeasor's failure to properly fill an order for birth control pills does not, as a matter of law, have to abort or place the child for adoption in order to have reasonably mitigated damages; the plaintiff parents are entitled to have the jury instructed that they may not, in computing damages, take into consideration the fact that the plaintiffs might have aborted the child or placed the child for adoption.

Appeal from Wayne, Joseph G. Rashid, J. Submitted Division 1 February 5, 1970, at Detroit. (Docket No. 6992.) Decided February 26, 1971. Leave to appeal denied June 3, 1971, 385 Mich 753.

Complaint by John E. Troppi and Dorothy M. Troppi, his wife, against Frank H. Scarf, doing business as Scarf's Drug Store, for damages for negligently supplying a prescription drug. Summary judgment for defendant. Plaintiff appeals. Reversed and remanded for trial.

*Temple & Cutler,* for plaintiffs.

*Sullivan, Sullivan, Ranger & Ward,* for defendant.

Before: LEVIN, P. J., and J. H. GILLIS and BRONSON, JJ.

LEVIN, P. J. In this case we consider the civil liability of a pharmacist who negligently supplied the wrong drug to a married woman who had ordered an oral contraceptive and, as a consequence, became pregnant and delivered a normal, healthy child.

1.

A summary judgment was entered dismissing the complaint of the plaintiffs, John and Dorothy Trop-

pi, on the ground that it does not state a claim upon which relief can be granted. In our appraisal of the correctness of the trial judge's ruling we accept as true plaintiffs' factual allegations.

In August 1964, plaintiffs were the parents of seven children, ranging in age from 6 to sixteen years of age. John Troppi was 43 years old, his wife 37.

While pregnant with an eighth child, Mrs. Troppi suffered a miscarriage. She and her husband consulted with their physician and decided to limit the size of their family. The physician prescribed an oral contraceptive, Norinyl, as the most desirable means of insuring that Mrs. Troppi would bear no more children. He telephoned the prescription to defendant, Frank H. Scarf, a licensed pharmacist. Instead of filling the prescription, Scarf negligently supplied Mrs. Troppi with a drug called Nardil, a mild tranquilizer.

Believing that the pills she had purchased were contraceptives, Mrs. Troppi took them on a daily basis. In December, 1964, Mrs. Troppi became pregnant. She delivered a well-born son on August 12, 1965.

Plaintiffs' complaint alleges four separate items of damage: (1) Mrs. Troppi's lost wages; (2) medical and hospital expenses; (3) the pain and anxiety of pregnancy and childbirth; and (4) the economic costs of rearing the eighth child.

In dismissing the complaint the judge declared that whatever damage plaintiffs suffered was more than offset by the benefit to them of having a healthy child.

## II.

Contraception, conjugal relations, and childbirth are highly charged subjects. It is all the more

important, then, to emphasize that resolution of the case before us requires no intrusion into the domain of moral philosophy. At issue here is simply the extent to which defendant is civilly liable for the consequences of his negligence. In reversing and remanding for trial, we go no further than to apply settled common-law principles.

We begin by noting that the fundamental conditions of tort liability are present here. The defendant's conduct constituted a clear breach of duty. A pharmacist is held to a very high standard of care in filling prescriptions. When he negligently supplies a drug other than the drug requested, he is liable for resulting harm to the purchaser.

As early as 1882, the Michigan Supreme Court recognized that a pharmacist's negligence in providing the wrong drug is actionable. In *Brown* v. *Marshall* (1882), 47 Mich 576, 583, plaintiff requested Epsom salts from her druggist, who instead sold her zinc sulphate. Plaintiff suffered severe burns. The Court declared:

"The case, it must be conceded, is one in which a very high degree of care may justly be required. People trust not merely their health but their lives to the knowledge, care and prudence of druggists, and in many cases a slight want of care is liable to prove fatal to some one. It is therefore proper and reasonable that the care required shall be proportioned to the danger involved."

We assume, for the purpose of appraising the correctness of the ruling dismissing the complaint, that the defendant's negligence was a cause in fact of Mrs. Troppi's pregnancy.[1] The possibility that

---

[1] We note that this is not a product liability case. It is not claimed that Mrs. Troppi's pregnancy was attributable to the use of defective birth control pills or that she was misled by a misrepresentation concerning the effectiveness of birth control pills as a means of con-

she might become pregnant was certainly a foreseeable consequence of the defendant's failure to fill a prescription for birth control pills; we, therefore, could not say that it was not a proximate cause of the birth of the child.[2]

Setting aside, for the moment, the subleties of the damage question, it is at least clear that the plaintiffs have expended significant sums of money as a direct and proximate result of the defendant's negligence. The medical and hospital expenses of Mrs. Troppi's confinement and her loss of wages arose from the defendant's failure to fill the prescription properly. Pain and suffering, like that accompanying childbirth, have long been recognized as compensable injuries.

This review of the elements of tort liability points up the extraordinary nature of the trial court's holding that the plaintiffs were entitled to no recovery as a matter of law. We have here a negligent, wrongful act by the defendant, which act directly and proximately caused injury to the plaintiffs.

What we must decide is whether there is justification here for a departure from generally applicable, well-established principles of law:

"The general rule of damages in an action of tort is that the wrongdoer is liable for all injuries resulting directly from the wrongful acts, whether they could or could not have been foreseen by him, provided the particular damages in respect to which he proceeds are the legal and natural consequences of the wrongful act imputed to the defendant, and

traception. In a product liability case the causation issue is likely to be hotly contested and the proofs complex.

[2] On the relationship between "case in fact" and "proximate cause", see Prosser, Torts (3d ed), § 41, p 240; 2 Harper and James, Torts, § 20.4, p 1132. As to foreseeable consequences, see Prosser, Torts (3d ed), § 50, p 288; 2 Harper and James, Torts, § 20.5, p 1134.

are such as, according to common experience and the usual course of events, might reasonably have been anticipated. Remote, contingent, or speculative damages will not be considered in conformity to the general rule above laid down." *Van Keulen & Winchester Lumber Co.* v. *Manistee & N. R. Co.* (1923), 222 Mich 682, 687.[3]

### III.

The trial judge based his decision upon what he perceived to be the law "announced by a majority of the courts in this country". But, as yet, no appellate court has passed upon the liability of a pharmacist for negligently dispensing oral contraceptives. Several cases have, indeed, dealt with the liability of physicians for failure to exercise due care in the therapeutic or elective sterilization of patients. Because the elements of damage in these cases correspond to some of the damages prayed for here, the decisions deserve scrutiny.

In *Christensen* v. *Thornby* (1934), 192 Minn 123 (255 NW 620, 93 ALR 570), a physician had warned that the plaintiff's wife might not survive the birth of another child. Plaintiff consented to a sterilization operation which the defendant surgeon performed. Although the surgeon represented that the operation was successful, the plaintiff's wife subsequently became pregnant and delivered a healthy child. The plaintiff sued for the medical expenses and his anxiety occasioned by fears for his wife's health.

The Minnesota Supreme Court affirmed an order of the trial court sustaining defendant's demurrer upon two grounds. The first was that since the plaintiff had sued for deceit, not negligence, proof

---

[3] Similarly, see *Sutter* v. *Biggs* (1966), 377 Mich 80, 86.

of fraudulent intent was required. Second, the plaintiff had suffered no damage (p 126):

"The purpose of the operation was to save the wife from the hazards to her life which were incident to childbirth. It was not the alleged purpose to save the expense incident to pregnancy and delivery. The wife has survived. Instead of losing his wife, the plaintiff has been blessed with the fatherhood of another child."

That case is, of course, distinguishable from the one before us. The plaintiff husband in *Christensen* made no claim that the child itself or the economic consequences of its birth were unwanted. The operation was directed at the threat to his wife's health. Since her health remained unimpaired, no damage was suffered. That the husband could not have foreseen that his wife would emerge unscathed and his anxiety was therefore quite justified was a factor the court did not discuss.

In *Shaheen* v. *Knight* (Pa, 1957), 11 D & C2d 41, 45, 46, a Pennsylvania *nisi prius* court ruled that a physician who violated his promise to perform an effective, elective sterilization operation was not liable for the consequences of his breach of contract. Plaintiff, the father of four children, wanted no more. As a result of an ineffective sterilization, plaintiff was able to impregnate his wife, who delivered a healthy baby. After finding defendant in breach of contract, the court said:

"Defendant argues, however, and pleads, that plaintiff has suffered no damage. We agree with defendant. The only damages asked are the expenses of rearing and educating the unwanted child. We are of the opinion that to allow damages for the normal birth of a normal child is foreign to the universal public sentiment of the people.

"Many consider the sole purpose of marriage a union for having children.   *   *   *

"To allow damages in a suit such as this would mean that the physician would have to pay for the fun, joy and affection which plaintiff Shaheen will have in the rearing and educating of this, [plaintiff's] fifth child.  Many people would be willing to support this child were they given the right of custody and adoption, but according to plaintiff's statement, plaintiff does not want such.  He wants to have the child and wants the doctor to support it. In our opinion to allow damages would be against public policy."

Underlying the *Shaheen* opinion are two principal ideas.  The first is that the birth of a healthy child confers such an undoubted benefit upon the plaintiff as to outweigh, as a matter of law, the expenses of delivering and rearing the child.  The second is that if the child is really unwanted, plaintiff has a duty to place him for adoption, in effect to mitigate damages.  We defer for the moment our evaluation of these concepts, while noting their relevance to the issues at hand.

Different questions were presented to the New Jersey Supreme Court in *Gleitman* v. *Cosgrove* (1967), 49 NJ 22, 29 (227 A2d 689, 693, 22 ALR3d 1411).  Mrs. Gleitman contracted rubella (German measles) during her pregnancy and subsequently gave birth to a deformed child.  The infant and his parents sued the defendant physician for malpractice, alleging that he had negligently failed to warn Mrs. Gleitman of the likelihood that her child would be born defective.  As a result of his negligence, Mrs. Gleitman did not seek a therapeutic abortion.

The majority of the court assumed that Mrs. Gleitman could have obtained a lawful abortion, but

nonetheless affirmed the decision of the trial court dismissing the complaint as to all three plaintiffs.

The majority distinguished between the rights of the infant plaintiff and those of his parents. As to the infant, the court held in essence that it could not countenance an action for "wrongful life".

A more difficult question was presented by the parents' claim for compensatory damages. The court disposed of this claim in extraordinary fashion. Of principal relevance to the case before us is the holding that compensatory damages were too uncertain to be awarded:

"In order to determine their compensatory damages a court would have to evaluate the denial to them of the intangible, unmeasurable, and complex human benefits of motherhood and fatherhood and weigh these against the alleged emotional and money injuries."

Three of the seven justices were of the view that money damages were ascertainable with reasonable precision and would have allowed the parents' claim to be presented to the trier of fact.

In *Milde* v. *Leigh* (1947), 75 ND 418 (28 NW2d 530, 173 ALR 738), the defendant negligently performed a therapeutic sterilization operation upon the plaintiff's wife and she subsequently delivered a healthy child. The appeal was taken by the defendant from an order of the trial court rejecting his defense of the statute of limitations. In affirming this order, the North Dakota Supreme Court declared that the plaintiff could recover for loss of his wife's services, society, and companionship during her pregnancy, as well as for medical expenses occasioned by her confinement.

A comprehensive review of the cases dealing with negligent sterilization was conducted by a Califor-

nia intermediate appellate court in *Custodio* v.
*Bauer* (1967), 251 Cal App 2d 303, 325 (59 Cal Rptr
463, 476, 477, 27 ALR3d 884).  Plaintiffs, husband
and wife, had eight children.  The defendant physi-
cian recommended that Mrs. Custodio be sterilized,
citing her large family and uncertain health.  After
the operation, she became pregnant and delivered a
healthy baby.  The plaintiffs sued for medical ex-
penses, Mrs. Custodio's physical damage, her pain
and suffering, and the cost of supporting the child
until he reached maturity.  The trial court dis-
missed the suit before trial.

Expressly rejecting *Christensen* v. *Thornby, su-
pra,* and *Shaheen* v. *Knight, supra,* the California
appeals court reversed, noting "some trend of
change in social ethics with respect to the family
establishment" and declared:

"It is clear that if successful on the issue of lia-
bility, [plaintiffs] have established a right to more
than nominal damages."

How the excess over nominal damages was to be
determined was not specified, beyond this sugges-
tion:

"Where the mother survives without casualty
there is still some loss.  She must spread her socie-
ty, comfort, care, protection and support over a
larger group.  If this change in the family status
can be measured economically it should be as com-
pensable as the former losses." (*Custodio, supra,*
323, 324.)

Additional decisions recognizing that there is a
cause of action for negligent sterilization are *Jack-
son* v. *Anderson* (Fla App, 1970), 230 So 2d 503;
*Bishop* v. *Byrne* (SD W Va, 1967), 265 F Supp 460;

*cf. Doerr* v. *Villate* (1966), 74 Ill App 2d 332, 334, 335 (220 NE2d 767, 768).[4]

## IV.

Our review has been conducted to determine whether the defendant in this case should be exempted from the consequences of his negligence. We conclude that there is no valid reason why the trier of fact should not be free to assess damages as it would in any other negligence case.

*Public Policy.* The trial court found that "to allow damages such as claimed here would be in contravention of public policy". A judicial declaration of pre-emptive public policy should express the manifest will of the people. Not only does contraception not violate the public policy of the State of Michigan, the legislature has recently enacted two separate statutes designed to foster the use of contraceptives. Family planning services may be supplied to medically indigent women by the State, upon request; the availability of such services is to be made known to prospective recipients of public

---

[4] *Cf. Ball* v. *Mudge* (1964), 64 Wash 2d 247, 250 (391 P2d 201, 204). A physician had performed a vasectomy upon the plaintiff. This operation had been prompted by fears for the health of Mrs. Ball if she became pregnant again, as well as by a desire on the part of Mr. and Mrs. Ball to avoid the expense of rearing a fourth child. Despite the vasectomy, Mrs. Ball again became pregnant and delivered a healthy baby. The plaintiffs appealed a *jury verdict* in favor of the physician and argued that they should have been granted a directed verdict on the issue of negligence. This was rejected on the ground that subsequent fertility is not conclusive proof that a vasectomy was negligently performed. As to damages, the Court observed:

"As reasonable persons, the *jury* may well have concluded that appellants suffered no damage in the birth of a normal, healthy child, whom they dearly love, would not consider placing for adoption, and 'would not sell for $50,000,' and that the cost incidental to such birth was far outweighed by the blessing of a cherished child, albeit an unwanted child at the time of conception and birth." (Emphasis supplied.)

The Washington Supreme Court expressly avoided the defendant's contention that the trial court should not have permitted the case to go to the jury.

health services.[5] Another statute goes a step further; it provides that the Department of Social Welfare may

"make available upon request of recipients of public assistance advice and treatment in family planning by referral upon request of the recipient to a licensed medical doctor * * * . Necessary drugs and recognized medical appliances for use in family planning may also be made available through licensed pharmacists upon prescription." MCLA § 400.14b (Stat Ann 1968 Rev § 16.414[2]).

Where the State's advocacy of family planning is so vigorous as to include payments for contraceptives as part of the welfare program, public policy cannot be said to disfavor contraception. The notion that public policy may favor contraception for the poor, yet disapprove of it for the more affluent, is unworthy of serious discussion.

Contraceptives are used to prevent the birth of healthy children. To say that for reasons of public policy contraceptive failure can result in no damage as a matter of law ignores the fact that tens of millions of persons use contraceptives daily to avoid the very result which the defendant would have us say is always a benefit, never a detriment. Those tens of millions of persons, by their conduct, express the sense of the community.

Contraception has been held to be within a constitutionally protected "zone of privacy" that surrounds the marital relationship.[6] The State may not infringe upon the rights of husband and wife to use contraceptives to limit the size of their family. Since the State may not infringe upon this right, it

---

[5] MCLA § 325.7a (Stat Ann 1969 Rev § 14.7[1]).

[6] *Griswold* v. *Connecticut* (1965), 381 US 479, 485 (85 S Ct 1678, 14 L Ed 2d 510). See *Brodie,* Marital Procreation, 49 Or L Rev 245 (1970).

may not constitutionally denigrate the right by completely denying protection provided as a matter of course to like rights.[7]

In theory at least, the imposition of civil liability encourages potential tortfeasors to exercise more care in the performance of their duties, and, hence, to avoid liability-producing negligent acts.[8] Applying this theory to the case before us, public policy favors a tort scheme which encourages pharmacists to exercise great care in filling prescriptions. To absolve defendant of all liability here would be to remove one deterrent against the negligent dispensing of drugs. Given the great numbers of women who currently use oral contraceptives, such absolution cannot be defended on public policy grounds.

*Overriding Benefit.* It is arguable that the birth of a healthy child confers so substantial a benefit as to outweigh the expenses of his birth and support. In the great majority of cases, this is no doubt true, else, presumably, people would not choose to multiply so freely. But can we say, as a matter of law, that a healthy child always confers such an overriding benefit?

The so-called "benefit rule" is pertinent. The Restatement declares:

"Where the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred upon the plaintiff a special benefit to the interest which was harmed, the value of the benefit conferred is considered in mitigation of damages, where this is equitable." Restatement, Torts, § 920, p 616.

---

[7] Compare 1 Antieau, Modern Constitutional Law, § 7:13, p 542; § 8:10, p 574.

[8] Prosser, Torts (3d ed), § 4, p 23; 2 Harper and James, Torts, § 11.5, p 742.

Thus, if the defendant's tortious conduct conferred a benefit to the same interest which was harmed by his conduct, the dollar value of the benefit is to be subtracted from the dollar value of the injury in arriving at the amount of damages properly awardable.[9]

Since pregnancy and its attendant anxiety, incapacity, pain, and suffering are inextricably related to child bearing, we do not think it would be sound to attempt to separate those segments of damage from the economic costs of an unplanned child in applying the "same interest" rule. Accordingly, the benefits of the unplanned child may be weighed against all the elements of claimed damage.

The trial court evidently believed, as did the court in *Shaheen* v. *Knight, supra,* that application of the benefits rule prevents any recovery for the expenses of rearing an unwanted child. This is unsound. Such a rule would be equivalent to declaring that in every case, as a matter of law, the services and companionship of a child have a dollar equivalent greater than the economic costs of his support, to say nothing of the inhibitions, the restrictions, and the pain and suffering caused by pregnancy and the obligation to rear the child.

There is a growing recognition that the financial "services" which parents can expect from their offspring are largely illusory. As to companionship, cases decided when "loss of companionship" was a compensable item of damage for the wrongful death of a child reveal no tendency on the part of juries to value companionship so highly as to outweigh expenses in every foreseeable case.

Our discussion should not be construed as an expression of doubt as to the efficacy of the benefits

---

[9] *Burtraw* v. *Clark* (1894), 103 Mich 383; 22 Am Jur 2d, Damages, § 204, p 283; McCormick, Damages, § 40, p 146.

rule in cases like the one before us. On the contrary, we believe that rule to be essential to the rational disposition of this case and the others that are sure to follow. The benefits rule allows flexibility in the case-by-case adjudication of the enormously varied claims which the widespread use of oral contraceptives portends.

What must be appreciated is the diversity of purposes and circumstances of the women who use oral contraceptives. Unmarried women who seek the pleasures of sexual intercourse without the perils of unwed motherhood, married women who wish to delay slightly the start of a family in order to retain the career flexibility which many young couples treasure, married women for whom the birth of another child would pose a threat to their own health or the financial security of their families, all are likely users of oral contraceptives. Yet it is clear that in each case the consequences arising from negligent interference with their use will vary widely. A rational legal system must award damages that correspond with these differing injuries. The benefits rule will serve to accomplish this objective.

Consider, for example, the case of the unwed college student who becomes pregnant due to a pharmacist's failure to fill properly her prescription for oral contraceptives. Is it not likely that she has suffered far greater damage than the young newlywed who, although her pregnancy arose from the same sort of negligence, had planned the use of contraceptives only temporarily, say, while she and her husband took an extended honeymoon trip? Without the benefits rule, both plaintiffs would be entitled to recover substantially the same damages.

Application of the benefits rule permits a trier of fact to find that the birth of a child has materially

benefitted the newly wed couple, notwithstanding the inconvenience of an interrupted honeymoon, and to reduce the net damage award accordingly. Presumably a trier of fact would find that the "family interests" of the unmarried coed has been enhanced very little.

The essential point, of course, is that the trier must have the power to evaluate the benefit according to all the circumstances of the case presented. Family size, family income, age of the parents, and marital status are some, but not all, the factors which the trier must consider in determining the extent to which the birth of a particular child represents a benefit to his parents. That the benefits so conferred and calculated will vary widely from case to case is inevitable.

*Mitigating Damages.* It has been suggested that parents who seek to recover for the birth of an unwanted child are under a duty to mitigate damages by placing the child for adoption. If the child is "unwanted", why should they object to placing him for adoption, thereby reducing the financial burden on defendant for his maintenance?

However, to impose such a duty upon the injured plaintiff is to ignore the very real difference which our law recognizes between the avoidance of conception and the disposition of the human organism after conception. This most obvious distinction is illustrated by the constitutional protection afforded the right to use contraceptives, while abortion is still a felony in most jurisdictions. At the moment of conception, an entirely different set of legal obligations is imposed upon the parents. A living child almost universally gives rise to emotional and spiritual bonds which few parents can bring themselves to break.

Once a child is born he obviously should be treated with love regardless of whether he was wanted when he was conceived. Many, perhaps most, persons living today are conceptional accidents in the sense that their parents did not desire that a child result from the particular intercourse in which the person was conceived. Nevertheless, when the child is born, most parents accept him with love. That the plaintiffs accepted their eighth child does not change the fact that the birth of another child, seven years younger than the youngest of their previously born children, unbalanced their life style and was not desired by them.

The doctrine which requires a plaintiff to take measures to minimize the financial consequences of a defendant's negligence requires only that reasonable measures be taken.[10]

"If the effort, risk, sacrifice, or expense which the person wronged must incur in order to avoid or minimize a loss or injury is such that under all the circumstances a reasonable man might well decline to incur it, a failure to do so imposes no disability against recovering full damages." McCormick, Damages, § 35, p 133.

It should be noted that the standards by which reasonable conduct is determined are less stringent when used to evaluate the subsequent acts of the injured party than when used to evaluate the tortious act itself.[11]

---

[10] "Where one person has committed a tort * * * against another, it is incumbent upon the latter to use such means as are reasonable under the circumstances to avoid or minimize the damages." McCormick, Damages, § 33, p 127; *Talley* v. *Courter* (1892), 93 Mich 473; *Smith* v. *Jones* (1969), 382 Mich 176, 186.

[11] Courts have been reluctant, for example, to require that plaintiffs submit to surgical procedures that are more than routine. Where ethical or religious scruples prevent a plaintiff from submitting to relatively minor surgery, the trier of fact may consider these scruples as part of the circumstances which bear upon the reasonableness of

In determining reasonableness, the best interests of the child must be considered. The law has long recognized the desirability of permitting a child to be reared by his natural parents.[12] The plaintiffs may have believed that the hazards of adoption would damage the child.

A child will not be taken from his mother without her consent, without regard to whether the child was conceived or born in wedlock, unless the child is neglected or the mother is unfit. The mother's right to keep the child is not dependent on whether she desired the conception of the child.

As a matter of personal conscience and choice parents may wish to keep an unwanted child. Indeed, parents have been known to keep children that many think should be institutionalized, *e.g.*, mentally retarded children, not because of any anticipated joy or happiness that the child will bring to them but out of a sense of obligation. So, too, the parents of an unplanned, healthy child may feel, and properly so, that whether they wanted the child or not is beside the point once the child is born and that they have an obligation to rear the child as best they can rather than subject him to rearing by unknown persons.

Further, even though the parents may not want to rear the child they may conclude that the psychological impact on them of rejecting the child and placing him for adoption, never seeing him again, would be such that, making the best of a bad situation, it is better to rear the child than to place him for adoption.

---

his conduct. McCormick, Damages, § 36, p 136; 22 Am Jur 2d, Damages, § 39, p 63.  *Cf. Romankewiz* v. *Black* (1969), 16 Mich App 119.

[12] *In re Ernst* (1964), 373 Mich 337, 362–371; *In re Mathers* (1963), 371 Mich 516, 534; *Herbstman* v. *Shiftan* (1961), 363 Mich 64, 67; *In re Mark T.* (1967), 8 Mich App 122.

Many women confronted with an unwanted pregnancy will abort the fetus, legally or illegally. Some will bear the child and place him for adoption. Many will bear the child, keep and rear him. The defendant does not have the right to insist that the victim of his negligence have the emotional and mental makeup of a woman who is willing to abort or place a child for adoption. If the negligence of a tortfeasor results in conception of a child by a woman whose emotional and mental makeup is inconsistent with aborting or placing the child for adoption, then, under the principle that the tortfeasor takes the injured party as he finds him, the tortfeasor cannot complain that the damages that will be assessed against him are greater than those that would be determined if he had negligently caused the conception of a child by a woman who was willing to abort or place the child for adoption.

While the reasonableness of a plaintiff's efforts to mitigate is ordinarily to be decided by the trier of fact, we are persuaded to rule, as a matter of law, that no mother, wed or unwed, can reasonably be required to abort (even if legal) or place her child for adoption.[13] The plaintiffs are entitled to have the jurors instructed that if they find that negligence of the defendant was a cause in fact of the plaintiffs' injury, they may not, in computing the amount, if any, of the plaintiffs' damages, take into consideration the fact that the plaintiffs might have aborted the child or placed the child for adoption.

*Uncertainty of Damages.* Of the four items of damage claimed by plaintiffs, each is capable of reasonable ascertainment. The medical and hospi-

---

[13] In saying this we recognize that there is much discussion today about compulsory family planning. We do not mean to be understood as addressing ourselves to the constitutionality of such legislation if enacted.

tal expenses and Mrs. Troppi's lost wages may be computed with some exactitude. Plaintiffs' claimed pain and anxiety, if not capable of precise determination, is a component of damage which triers of fact traditionally have been entrusted to ascertain. As to the costs of rearing the child until his majority, this is a computation which is routinely performed in countless cases.

It should be clear that ascertainment of *gross* damages is a routine task. Whatever uncertainty attends the final award arises from application of the benefits rule, which requires that the trier of fact compute the dollar value of the companionship and services of an unwanted child. Placing a dollar value on these segments may well be more difficult than assessing damages for, say, Mrs. Troppi's lost wages. But difficulty in determining the amount to be subtracted from the gross damages does not justify throwing up our hands and denying recovery altogether.

Michigan law is clear that there need only be a basis for reasonable ascertainment of the amount of the damages. Where the fact of liability is proven, difficulty in determining damages will not bar recovery. As the Michigan Supreme Court noted in *Allison* v. *Chandler* (1863), 11 Mich 542, 554.

"The law does not require impossibilities; and can not, therefore, require a higher degree of certainty than the nature of the case admits."

More recently, the Court said in *Purcell* v. *Keegan* (1960), 359 Mich 571, 576:

"But where injury to some degree is found, we do not preclude recovery for lack of precise proof. We do the best we can with what we have. We do not, 'in the assessment of damages, require a mathematical precision in situations of injury where,

from the very nature of the circumstances, precision is unattainable.' Particularly is this true where it is defendant's own act or neglect that has caused the imprecision."

Moreover, the Michigan Supreme Court has repeatedly recognized that the dollar value of a child's services and companionship is not too uncertain to be left to the judgment of the trier of fact. Beginning in 1960, with *Wycko* v. *Gnodtke* (1960), 361 Mich 331, recovery for the wrongful death of a child was measured by considering, among other elements of damage, the value of his services and companionship. Although there was spirited dissent as to the statutory basis of this rule, subsequent cases reflected no feeling on the part of the Court that these damages were too uncertain to be entrusted to determination by the trier of fact.[14] The recent disavowel of *Wycko* in *Breckon* v. *Franklin Fuel Company* (1970), 383 Mich 251, involved a question of statutory interpretation, and not the specificity of the measure of damages.

The assessment of damages in this is properly within the competence of the trier of fact. The element of uncertainty in the net recovery does not render the damages unduly speculative.

Reversed and remanded for trial.

BRONSON, J., concurred.

J. H. GILLIS, J., concurred in result.

[14] See *Routsaw* v. *McClain* (1961), 365 Mich 167, 171; *Godwin* v. *Ace Iron & Metal Company* (1965), 376 Mich 360, 368, 369; *Wolverine Upholstery Company* v. *Ammerman* (1965), 1 Mich App 235, 244, 245; *Howard* v. *City of Melvindale* (1970), 27 Mich App 227.