Geraldine **FLOWERS**, Appellant,

v.

**DISTRICT OF COLUMBIA**, Appellee.

No. 82–133.

District of Columbia Court of Appeals.

Argued July 5, 1983.

Decided July 12, 1984.

Barry H. Gottfried, Washington, D.C., for appellant.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D.C., with whom Judith W. Rogers, Corp. Counsel, Washington, D.C., at the time the brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

John Lewis Smith III, Lee T. Ellis, Jr., Jeffrey S. Holik, and Andrew O. Eshelman, Washington, D.C., filed a brief for amicus curiae, The Medical Society of the District of Columbia.

Before FERREN, Associate Judge, and PAIR and KERN,* Associate Judges, Retired.

KERN, Associate Judge, Retired:

This appeal comes to the court upon an Agreed Statement in lieu of the Record on Appeal pursuant to DCCA Rule 10(k). Ac-cording to the agreed statement of facts, after the birth of appellant's third child, appellant and the father of two of her children determined that they could not afford additional children. Therefore, on May 9, 1978, appellant underwent a laparo-scopic cauterization to prevent her from becoming pregnant in the future. This sur-gery was performed by Dr. Marsha Berke-ley, assisted by Dr. Richard Peters, both of whom were agents of the District.

In October 1980, appellant filed suit against the District of Columbia under the principle of respondeat superior, alleging that the tubal cauterization had been negli-gently performed and as a proximate result she had become pregnant and given birth to a healthy baby on June 30, 1980.

Appellant sought in the trial court com-pensation from the District of Columbia for: her medical expenses, her pain and suffering, and her lost wages, all incurred during her pregnancy;

—the wages she lost after the birth of her child until she could return to work;

—the cost of a properly performed tubal ligation she might undergo in the future; and,

—all costs of rearing her healthy baby until the child reached the age of 18.

The trial court ruled that appellant may not pursue her claim that the District, as a result of its doctors' negligence, must pay the costs of rearing her child. Otherwise, the court permitted appellant's other claims for relief to be presented to the jury and the jury returned a verdict in appellant's favor in the amount of $11,000.

Appellant only challenges the trial court's ruling *in limine* that her claim for child-rearing costs from the doctors might not be pursued. Appellant contends on appeal (Brief at 4), that

when she negligently failed to perform an effective tubal cauterization, Dr. Mar-

---

* Judge Kern was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on May 25, 1984.

sha Berkeley breached her duty to plaintiff Flowers [appellant]. Dr. Berkeley's culpable conduct foreseeably resulted in the birth ... and meant that plaintiff would be required to bear the costs of maintaining, supporting, and educating a fourth child whom she had decided she could not afford.... Judge Doyle's decision unjustifiably departed from a fundamental principal of District of Columbia law: it is the function of a jury to decide whether to compensate a plaintiff for injuries that result from a tortfeasor's negligence.

Appellant further urges (Brief at 4–5): [T]riers-of-fact have awarded damages for a wide range of injuries caused by a tortfeasor's negligence.

\*     \*     \*     \*     \*     \*

[C]ases involving negligent sterilizations should not be treated differently: a jury should be permitted to award damages for all injuries, including the net costs of raising an unplanned child.

In addition to urging this court to treat this case as a typical negligence case to which established tort law should be applied, appellant also suggests (Brief at 6) a public policy reason for permitting a jury to award the cost of rearing a healthy child after a surgical sterilization has failed by reason of alleged negligence:

Where a physician's negligence results in the birth of an unplanned child, a substantial interference with the fundamental rights of a parent to control family size results, with potentially catastrophic financial consequences. The policy of preserving the right of parental control of family size would be furthered by subjecting physicians to full civil liability for the cost of raising the unplanned child.

The public policy consideration appellant urges upon us as a rationale for imposing upon the District the costs of rearing appellant's unplanned child impels us to note the comment by Judge Oberdorfer of the federal district court here in ruling upon a similar claim for damages:

[T]here is something inherently distasteful about a holding that a child is not worth what it costs to raise it, and something seemingly unjust about imposing the entire cost of raising the child on the physician, creating in the words of one court "a new category of surrogate parent." [*Hartke v. McKelway*, 526 F.Supp. 97, 104 (D.D.C.1981), *rev'd in part and aff'd in part on other grounds, Hartke v. McKelway*, 707 F.2d 1544 (D.C.Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 425, 78 L.Ed.2d 360 (1983)].

It is true that the able District Court judge went on to acknowledge that, when the parents of an unplanned child had chosen not to have more children because of the financial cost of rearing such a child, "it seems wrong" for a court to hold as a matter of law that the child "is worth the costs of raising her." [1] Nevertheless, the District Court's comment points up, contrary to appellant's urging, that the "public policy" considerations are *not* weighted in favor of imposing the child-rearing costs upon the physicians rather than the parents. Indeed, the weight of authority seems to disfavor the public policy appellant urges this court to adopt.[2]

1. The court concluded in that particular case that "to allow her [the plaintiff] to recover the costs of raising this child would be to give her a windfall," relying upon the facts (1) that the plaintiff "greatly cherished" her child, and "chose not to have an abortion," and (2) that plaintiff had *not* been motivated by economic reasons when choosing sterilization. *Id.* at 104–05.

2. Thus, the trial court's ruling that the cost of rearing an unplanned child is *not* recoverable is in accord with recent decisions by the highest courts in Alabama, Arkansas, Delaware, Florida, Illinois, Iowa, Kentucky, New Hampshire, Pennsylvania, Wisconsin and Wyoming. *See Boone v. Mullendore*, 416 So.2d 718 (Ala.1982); *Wilbur v. Kerr*, 275 Ark. 239, 628 S.W.2d 568 (1982); *Coleman v. Garrison*, 349 A.2d 8 (Del.1975); *Fassoulas v. Ramey*, 450 So.2d 822 (Fla.1984); *Cockrum v. Baumgartner*, 95 Ill.2d 193, 69 Ill. Dec. 168, 447 N.E.2d 385 (1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 149, 78 L.Ed.2d 139 (1984); *Schork v. Huber*, 648 S.W.2d 861 (Ky. 1983); *Nanke v. Napier*, 346 N.W.2d 520 (Iowa

We turn now to appellant's contention that in effect this case is nothing more than a typical medical malpractice case, requiring merely the application of standard principles of tort law.[3] If we were to accept appellant's urging then the trial court would have been required to apply in the instant case both the well established "benefit rule" and the "avoidable consequences" doctrine.

██ The benefit rule states:

When the defendant's tortious conduct has caused harm to the plaintiff ... and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, *the value of the benefit conferred is considered in mitigation of damages*, to the extent that this is equitable. [RESTATEMENT (SECOND) OF TORTS, § 920 (1979 (emphasis added).]

The application of this settled rule to the instant case would necessarily put at issue before the jury the dollar value to appellant of her child and require testimony and evidence on both economic *and other* advantages and disadvantages of having her in being. Thus, a parent seeking to recover for an unplanned child will be strongly tempted to denigrate the child's value to the extent possible in order to obtain as large a recovery as possible. The Illinois Supreme Court recently commented concerning the adverse consequences of applying the benefit rule to a wrongful birth case:

It can be seen that permitting recovery then requires that the parents demonstrate *not only* that they did not want the child but that the child ... remains an uncherished, unwanted burden so as

to minimize the offset to which the defendant is entitled. [*Cockrum v. Baumgartner*, 95 Ill.2d 193, 202, 69 Ill.Dec. 168, 173, 447 N.E.2d 385, 390 (1983) (emphasis added).]

We are unpersuaded by the argument that the benefit rule would have the jury consider *only* the *economic* benefits accruing to the plaintiff as offsetting the cost of rearing the unwanted child. We are dealing here with children, not widgets; it is unrealistic to assume that the trier-of-fact could parse the dollars and cents benefits to parents from accruing a healthy child and the benefits less easily described but more deeply felt by the parents as a result of the birth of a healthy child.

According to Dean Prosser, in an action for the *wrongful death* of a minor, "any realistic view of the prospects must mean that the cost of rearing the child will far exceed any conceivable pecuniary benefits that might ever be optimistically expected of him; and damages honestly calculated on this basis could never be anything but a minus quantity. Nevertheless, in such cases substantial verdicts have been sustained where it is very evident that the jury have taken the bull by the horns, and in reality have compensated for the prohibited sentiment aspects of the family relation, with the court benevolently winking...." *Prosser, Handbook of the Law of Torts*, § 127 (4th ed. 1971). It is inescapable that as a practical matter juries will consider the emotional benefits and the other intangible advantages to the parents from having a child, as well as the child's monetary value to the parents.

1984); *Kingsbury v. Smith,* 122 N.H. 237, 442 A.2d 1003 (1982); *Mason v. Western Pennsylvania Hospital,* 499 Pa. 484, 453 A.2d 974 (1982); *Rieck v. Medical Protective Co.,* 64 Wis.2d 514, 219 N.W.2d 242 (1974); *Beardsley v. Wierdsma,* 650 P.2d 288 (Wyo.1982). *See also Terrell v. Garcia,* 496 S.W.2d 124 (Tex.Civ.App.1973), *cert. denied,* 415 U.S. 927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974); *P. v. Portadin,* 179 N.J.Super. 465, 432 A.2d 556 (1981); *Sorkin v. Lee,* 78 A.D.2d 180, 434 N.Y.S.2d 300 (1980). See generally,

Annot., 83 A.L.R.3d 15 (1978); Annot., 27 A.L. R.3d 906 (1969).

**3.** We are not here concerned with the foreseeability of the possible birth of a child with defects and we do not consider the measure of damages in such a case. *See Fassoulas v. Ramez, supra,* 450 So.2d 822 (Fla.1984) (no policy argument against parents being recompensed for the cost of extraordinary care in rearing a deformed child to majority).

The Supreme Court of New Jersey expressed considerable concern that were it to permit an award to the parents of the costs of rearing their child then the parents would retain "all the benefits inhering in the birth of the child ... while saddling defendants [the physicians] with the enormous expenses attending upon her rearing"; and, the court concluded that such an award "would be wholly disproportionate to the culpability involved." *Berman v. Allan*, 80 N.J. 421, 404 A.2d 8, 14 (1979).

The New York appellate court in *Sorkin v. Lee*, 78 A.D.2d 180, 184, 434 N.Y.S.2d 300, 303 (1980), opined that "to hold the physician responsible for the cost of future care of a healthy normal child based upon the parent's private decision on how to accept the unplanned pregnancy is to inflict a penalty on defendant [physician] that is out of proportion to his wrong."

■ In addition, were we to accept appellant's invitation to treat this case as we would a garden-variety medical malpractice case public policy considerations of extraordinary complexity would be raised when the trial court proceeded to apply, as it must, the rule of "avoidable consequences" to a wrongful birth case. The avoidable consequences doctrine is that "one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort...." *See* RESTATEMENT (SECOND) OF TORTS § 918 (1979). Applying such a standard rule to the wrongful birth case would mean that a plaintiff could recover for damages only if he could demonstrate to the court and jury that he could *not* have reasonably avoided the consequences

of the physicians' negligence; *viz.*, the birth of a healthy child. One obvious way of avoiding the consequences of a negligently performed surgical sterilization is to avoid the resultant parenthood by abortion; and another method is to place the child for adoption by others.[4] Thus, application of the avoidable consequences doctrine—the rule of law established in negligence cases—implicates controversial and emotionally charged issues and illustrates the unique concerns this case raises, *i.e.*, should the doctor be required to pay for the cost of rearing a healthy but unwanted child.

Application of both the benefit rule and the avoidable consequences doctrine to a negligence action of this sort illustrates not only that there are grave moral issues in the litigation of a wrongful birth action seeking recovery from the physician for the cost of rearing the child to majority, but also necessarily probe into a parent's beliefs about abortion, adoption and the value of a child's companionship—all highly personal matters that seem particularly unsuited for the traditional adversarial process of a negligence action in a court of law.

■ We note that the District of Columbia Council has announced a public policy which emphasizes the importance of a stable home environment and a secure family relationship for children. *See* D.C.Code § 16–4501 (1983 Supp.). Permitting parents to initiate litigation to force a third person to rear financially their child has a potentially destabilizing effect on families in the District, thereby implicating the Council's policy.[5] Our view is that to rule

---

4. We do not conclude that a court or jury would necessarily find abortion or adoption to be a reasonable method of avoiding the consequences of having to raise an unwanted child. We merely point out that a court or jury would necessarily be called upon to consider this alternative as an exercise of choice by the parent before having the child.

5. The Supreme Court of Arkansas, in *Wilbur v. Kerr*, 275 Ark. 239, 628 S.W.2d 568, 571 (1982), observed:

It is a question which meddles with the concept of life and the stability of the family unit. Litigation cannot answer every question; every question cannot be answered in terms of dollars and cents. We are also convinced that the damage to the child will be significant; that being an unwanted or "emotional bastard," who will some day learn that its parents did not want it, and in fact, went to court to force someone else to pay for its raising, will be harmful to that child. It will undermine

that a plaintiff may recover the cost of rearing her healthy but unplanned child is a matter best left to measured legislative action rather than to judicial fiat. Accordingly, the trial court's judgment must be and is

*Affirmed.*

FERREN, Associate Judge dissenting:

This "wrongful birth" action requires us, for the first time, to consider physician liability for a negligent sterilization that failed to prevent the birth of a child. The parents—who already had three children—decided solely for economic reasons not to have another child. The District of Columbia, as respondeat superior, does not contest the jury's findings that the physicians negligently performed the laparoscopic cauterization, and that this negligence legally caused appellant's fourth child and resulting financial predicament. Nor does the District question liability for the costs related to appellant's pregnancy. The only issue is the trial court's ruling that appellant, as a matter of law, may not recover damages for the additional costs of raising her unplanned child. Unlike my colleagues, I believe such costs should be recoverable under the circumstances here. I would reverse.

### I.

Obviously, both pregnancy and child rearing are foreseeable consequences of a negligently performed sterilization. They are "the consequences ... the operation was designed to forestall." *Custodio v. Bauer,* 251 Cal.App.2d 303, 317, 59 Cal. Rptr. 463, 472 (1967); *see Sherlock v. Stillwater Clinic,* 260 N.W.2d 169, 175 (Minn. 1977) (en banc); *Beardsley v. Wierdsma,* 650 P.2d 288, 294 (Wyo.1982) (Rose, C.J., specially concurring). The question, then, is whether a court should limit recovery of damages to the costs of the pregnancy, and thus preclude recovery of child-rearing costs, because of public policy considerations that distinguish wrongful birth ac-

society's need for a strong and healthy family

tions from other cases of medical malpractice.

My colleagues answer in the affirmative for three reasons:

1. A court order forcing a third party to pay child-rearing costs would have a "potentially destabilizing effect on families," *ante* at 1077, including an emotionally damaging impact on the child, who inevitably would come to know that he or she was unwanted.

2. In a wrongful birth case, a jury cannot meaningfully apply the "benefit rule," *i.e.,* the established rule of mitigation requiring the trier of fact to offset the value of any benefit conferred by negligent conduct (here, the value of a healthy child) against the damages attributable to that conduct (the costs of raising the child).

3. A jury cannot meaningfully apply the traditional rule of mitigation for "avoidable consequences" because of a public policy against coercing abortion or adoption.

I find none of these reasons persuasive.

### II.

The majority expresses a concern, *ante* at 1077 n. 5, that a court award of child-rearing expenses will emotionally damage a child who learns he or she was unwanted, and thus will have an unsettling effect on the entire family. That is not necessarily true. A decision not to have more children does not necessarily mean parents will be hostile to an unplanned child, let alone reject that child as a person. And millions of children who were unplanned—and, for a variety of reasons, have come to know it—are secure in their parents' love. I do not believe such emotional security is likely to be undermined by knowledge that the parents sought to enhance the child's and the siblings' well-being through litigation to mitigate financial difficulties.

I agree that, if child-rearing costs were awarded for physician negligence, the child in most instances eventually would learn

relationship....

that the parents, for financial reasons, had not wanted another child. But I am also inclined to believe that, even when child-rearing costs are not awardable in such cases, an unplanned child is likely to learn somewhere along the line, at a moment of parental frustration, that unplanned enlargement of the family has caused severe financial strain.[1] Accordingly, I perceive a greater threat to love and to corresponding emotional security for an unplanned child—and for all the other children in the family—when parents cannot make ends meet than when family finances have been stabilized through appropriate compensation for negligence. This court's decision today contributes more to the threat against emotional security than it protects against the possibility of emotional damage.

As I see it, therefore, in cases where parental love of an unplanned child is strong, the majority's decision is more likely to test that love than to encourage it. And if ever it is true that a parent becomes hostile to an unplanned child, the court's decision will foster, not mitigate, that hostility.

### III.

A number of courts on which the majority relies, *ante* at 1075 n. 2, premise the decision on a reverence for life that imputes only the prospect of joy, pride, and companionship—and thus only a family benefit—to the birth of a child. Virtually by definition, some courts have said, a parent cannot be damaged by a healthy baby. *Boone v. Mullendore*, 416 So.2d 718, 722 (Ala.1982). These courts accordingly have

denied child-rearing damages because calling a child an injury "offends fundamental concepts attached to life." *Schork v. Huber*, 648 S.W.2d 861, 862 (Ky.1983). "In a proper hierarchy of values the benefit of life should not be outweighed by the expense of supporting it." *Cockrum v. Baumgartner*, 95 Ill.2d 193, 201, 69 Ill. Dec. 168, 172, 447 N.E.2d 385, 389, *cert. denied*, —— U.S. ——, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983).

The problem is, despite our shared values about the sanctity of human life, it is naive—and often cruel—to say unequivocally that the birth of every child confers a benefit on every family that outweighs both the emotional and financial costs of supporting it.[2] *Hartke v. McKelway*, 228 U.S.App.D.C. 139, 147, 707 F.2d 1544, 1552, *cert. denied*, —— U.S. ——, 104 S.Ct. 425, 78 L.Ed.2d 360 (1983); *University of Arizona Health Sciences Center v. Superior Court of the State of Arizona*, 136 Ariz. 579, 584, 667 P.2d 1294, 1299 (1983) (en banc) [hereinafter *University of Arizona*].

Appellant testified that she arranged for sterilization because she and her husband could not financially afford to raise a fourth child.[3] The material and emotional well-being of the parents and their three children—the very stability of their family—would be undermined, she said, by the strain of spreading limited resources further. Appellant's practical, family-preserving outlook reflects the considered view of "tens of millions of people" who, through the use of contraceptives and sterilization, "express the sense of the community" that

---

**1.** It is not necessarily true that a child would be less likely to learn about litigation to recover the costs of the pregnancy—which my colleagues permit—than about litigation to recover the costs of child-rearing. Thus, the majority's concern that a child not learn he or she was unplanned must be premised on a belief that parents would keep secret a limited damage award, but not a complete damage award. That is a dubious proposition.

**2.** The logical consequence of this position is that any attempt to limit the size of one's family—at any point—is irrational.

**3.** This case differs from one in which parents sought sterilization for genetic or therapeutic reasons and, after the unplanned child was born, physicians ascertained that there was no damage to the child or mother. In such a case, the failure of the sterilization would not have resulted in the kind of injury anticipated, and thus no claim would lie for child-rearing expenses. *See e.g., Hartke, supra*, 228 U.S.App. D.C. at 148–49, 707 F.2d at 1553–54.

the birth of a child is not in every instance considered a benefit. *Troppi v. Scarf,* 31 Mich.App. 240, 253, 187 N.W.2d 511, 517 (1971); *accord Sherlock, supra,* 260 N.W.2d at 175.

The majority stops short of claiming that the birth of a child is always a net benefit. Instead, my colleagues argue that the very inquiry into how much of a benefit (or detriment) the child will be is itself offensive, as well as overly complicated. Accordingly, they assert that the required application of the established "benefit rule" of mitigation would be unseemly, as well as too difficult, in this context, and thus that the prospect of child-rearing damages should be altogether ignored.

The benefit rule—an application of the theory that when a tort benefits, as well as harms, a plaintiff the damages should be reduced accordingly—is set forth in the RESTATEMENT (SECOND) OF TORTS § 920 (1977):

> When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.

The reason is clear, if tautological: to the extent a plaintiff's interest benefits from negligence, it is not damaged.

The majority understands the benefit rule to mean, in this case, that the tangible financial damages attributable to negligent sterilization (*i.e.,* the costs of raising an unplanned child) would have to be reduced not only by the tangible benefits to be expected from the child (*e.g.,* earnings for the family during teenage years) but also by the *intangible* benefits of a child (*e.g.,* companionship and joy).[4] My colleagues are thus concerned that, in order to maximize the damage award, "a parent seeking to recover for an unplanned child will be strongly tempted to denigrate the child's value." *Ante* at 1076. This, they suggest, would be contrary to the District's policy favoring strong family relationships and, in any event, would present an "unrealistic" exercise for a jury to undertake. *Ante* at 1076.

The majority misconstrues the benefit rule. The damage offset for "the value of the benefit conferred," *id.,* is limited to offsetting a benefit of the same kind as "the interest of the plaintiff that was harmed." *Id.* "[D]amages resulting from an invasion of one interest are not diminished by showing that another interest has been benefited." *Id.,* comment b.[5] Accordingly, damages to a plaintiff's financial interest, *e.g.,* the costs of raising an unplanned child, are not diminished by benefits to a plaintiff's emotional interest, *e.g.,* the pride and joy in a new child. Parental pleasure cannot pay for food, clothing, and education.

Even when permitting recovery of child-rearing costs in wrongful birth actions, some courts have ignored this specific interest limitation of § 920 (as my colleagues do here), and have held that a jury may net together all the costs and benefits of raising a child—tangible and intangible. *University of Arizona, supra,* 136 Ariz. at 586, 667 P.2d at 1301; *id.* at 588–89, 667 P.2d at 1303–04 (Gordon, J., concurring and dissenting); *Jones v. Malinowski,* 299 Md.

---

4. Several courts have suggested that such intangible benefits may be discounted by intangible costs, *i.e.,* the frustrations and disappointments of child-rearing. *See, e.g., University of Arizona, supra,* 136 Ariz. at 586, 667 P.2d at 1301; *Jones v. Malinowski,* 299 Md. 257, 272–75, 473 A.2d 429, 437–38 (1984).

5. If, for example, a plaintiff claims damages for pain, humiliation, and suffering, the fact that the plaintiff's earning capacity, as a result, may be increased by publishing an account of the experience does not actually diminish plaintiff's pain and suffering; thus, evidence of that financial benefit cannot be used to offset plaintiff's damages. *Id.,* illustration 6. Similarly, in an action for defamation, a defendant cannot show that the publication financially benefited the plaintiff unless the plaintiff claims damages for harm to his or her pecuniary interest. *Id.,* illustration 4.

257, 271–75, 473 A.2d 429, 436–38 (1984). That misapplies the benefit rule and invites the kind of jury speculation my colleagues find "unrealistic."

I agree that such netting together of financial costs and intangible benefits of a child is unrealistic. But, instead of denying recovery altogether, I would allow recovery under what I believe is the proper application of the benefit rule. I would require a mother, first, to demonstrate by a preponderance of the evidence that she elected sterilization solely for economic reasons. In an effort to discredit that assertion, the physician (here, the District) should be able to inquire into her financial situation and motives, relying on discovery and cross-examination. A jury should be allowed to infer, for example, that a person of means could not credibly give economic reasons as the sole motive for sterilization.

Second, the mother must present expert evidence of anticipated reasonable child-rearing costs attributable to the negligent sterilization.[6] To be reasonable, these must be based on generally necessary, not elective, expenditures. The physician may rebut that presentation by showing the mother's damages are not as great as alleged because certain kinds of proposed expenses should not be considered necessary (*e.g.*, private schools, music lessons) and also because the family can anticipate some calculable financial benefits from the child, including income from earnings during teenage years and from any other source available to the child. However, evidence of emotional benefit ("satisfaction, love, joy, and pride")—as distinguished from financial benefit—cannot be introduced to offset financial injury. In

this case, therefore, evidence that appellant's child can be expected to provide emotional benefit is irrelevant, and the majority's concern about denigrating the child's value as a human being, in order to enhance recovery, is misplaced. *See generally* Note, *Judicial Limitations on Damages Recoverable for the Wrongful Birth of a Healthy Infant*, 68 U.VA.L.REV. 1311, 1326 (1982).[7]

## IV.

Finally, the majority rejects child-rearing damages because of policy problems with applying another established rule for mitigating damages: the rule of "avoidable consequences."

According to the RESTATEMENT (SECOND) OF TORTS § 918 (1977):

> [O]ne injured by the tort of another is not entitled to recover damages for any harm that [s]he could have avoided by the use of reasonable effort ....

The majority assumes that, strictly applied, this rule would deny recovery to a mother of an unplanned child, attributable to a negligent sterilization, who did not have good reasons for declining to seek an abortion or to put the child up for adoption. The majority then concludes that this would be an offensive inquiry, at odds with public policy, and thus that a court should not get into the quagmire that a claim for child-rearing costs would require.

I agree that this court should not tolerate an inquiry into a mother's reasons for not pursuing either of these alternatives. That would be an invasion of privacy and often an offense to religious beliefs. But the majority raises a bogus issue. These

---

**6.** *See Jones, supra,* 299 Md. at 272, 473 A.2d at 436 (plaintiff can present, through experts, foreseeable expenses of supporting and educating child to majority age by reference to typical expenditures, inflation, consumer price index, and other relevant economic criteria).

**7.** The majority suggests that there is no way to prevent the jury from considering intangible benefits, even in the face of an instruction to the contrary. If true, this need not trouble us un-

duly. Although jury consideration of such benefits might result in a lower damage award than appropriate, the jury's covert weighing of intangible benefits would have no emotional consequences for the family. Because the parents would not be permitted to introduce evidence of their emotional attitude toward the child, and would not be permitted to argue that attitude to the jury, there is no danger that the parents would denigrate the child's value in court.

very reasons why no such inquiry should be permitted make clear why abortion or adoption would not be a "reasonable effort," *id.*, for a jury to consider in applying the avoidable consequences rule. That rule limits recovery "only when [a plaintiff] is unreasonable in refusing or failing to take action to prevent further loss." *Id.*, comment c. I believe it is unreasonable for a court even to suggest that a woman consider an abortion. It is equally unreasonable to suggest that a woman who, for sound reasons, did not want another child must nonetheless consider putting that child up for adoption once the love inherent in a parent-child relationship has become a reality. *University of Arizona, supra,* 136 Ariz. at 586 n. 5, 667 P.2d at 1301 n. 5; *Jones, supra,* 299 Md. at 273–75, 473 A.2d at 437–38; *Troppi, supra,* 31 Mich.App. at 257–61, 187 N.W.2d at 519–20; *Sherlock, supra,* 260 N.W.2d at 176.

I do not understand how the majority— given its aversion to imposing the abortion-adoption alternatives—can nonetheless find them "reasonable" enough, under the avoidable consequences rule, "that a court or a jury would necessarily be called upon to consider" them. *Ante* at 1075 n. 4. The policy reasons advanced by the majority, with which I wholeheartedly agree, are enough in themselves to show why the avoidable consequences rule is no complication, let alone a barrier, to recovery here.

## V.

It appears that, because a child obviously can bring pride and joy to a family, and because the costs of an additional child can be avoided by alternatives, such as placement for adoption, the majority basically believes that an award of child-rearing costs would be wholly out of proportion to culpability, would place an unreasonable burden upon physicians (and their insurance carriers), and thus would be an undeserved windfall to the parents. *See, e.g.,*

*Coleman v. Garrison,* 349 A.2d 8, 12 (Del. 1975); *Kingsbury v. Smith,* 122 N.H. 237, 243, 442 A.2d 1003, 1006 (1982); *Berman v. Allan,* 80 N.J. 421, 432, 404 A.2d 8, 14 (1979); *Rieck v. Medical Protective Co.,* 64 Wis.2d 514, 519, 219 N.W.2d 242, 245 (1974).

I profoundly disagree. In a case where a plaintiff can prove that financial straits motivated sterilization, pride and joy in an unplanned child can be undermined by financial stress to the point of substantial deprivation and unhappiness. In the absence of awardable child-rearing costs, moreover, the pressures for abortion or adoption are unconscionable. Appellant seeks compensation only for provable financial injury from physician malpractice. Accordingly, this would not be a financial windfall; in effect, appellant merely would be sustained in the tight financial position she found herself in before the physicians' negligence.[8] The fact that the damage award can be large proves nothing; substantially larger awards are regularly ordered, without criticism, for medical malpractice that results in paralysis requiring lifetime care. There is no less reason to encourage due care in sterilization operations, through the prospect of full compensation for negligence, than there is in other areas of medical care.

It may be that the addition of a family member will be a windfall in the sense that any human life has incalculable potential value to self, family, and society. But any human being can create burdens as well. It is facile and presumptuous to say that in every case an additional child is a family blessing, to the point that a family already under severe financial pressure should pay for a physician's negligence.

It is important to note, in this connection, that there is mischief in the majority's resolution here for cases yet to come. Given

---

**8.** One should not lose sight of the fact that plaintiffs in this situation, as in all malpractice cases, will have to prove negligence and damages to a jury, subject to court-imposed remitti-

turs when verdicts are excessive. Traditional tort principles applied by a jury under proper court instructions and review are adequate safeguards to protect against excessive judgments.

my colleagues' analysis, I perceive no principled basis for awarding child-rearing costs if, following a negligent sterilization, an unplanned child is born deformed, or with substantially diminished capacity, requiring lifetime care. Is a family (or the state) also to bear the full burden of a physician's negligence when this happens? If not, a later court would have to modify the majority's premise and say that the baby is not altogether a blessing, and then allow recovery on the theory that the sanctity and benefits of some human lives can be ascertainably diminished to the point that the child is a net detriment to the parents.[9]

In barring recovery of child-rearing costs after a negligent sterilization, when a family can prove that economic necessity motivated the operation, this court in effect concludes that all will be well enough for the family, and thus that the persons responsible need not pay for the foreseeable consequences of their tortious conduct. I cannot subscribe to that view.

Respectfully, I dissent.

---

**9.** The majority's position would not necessarily preclude a child born with a disability (after a negligent sterilization of the mother) from bringing, in his or her own behalf, a "wrongful life" action to recover the costs of lifetime care. Courts, however, have not been inclined to permit such actions. *See, e.g., Berman, supra,* 80 N.J. at 427–33, 404 A.2d at 12–14; *Becker v.* *Schwartz,* 46 N.Y.2d 401, 409–15, 386 N.E.2d 807, 811–14, 413 N.Y.S.2d 895, 899–903 (1978) (permitting recovery by parents but not by child); *Dumer v. St. Michael's Hosp.,* 69 Wis.2d 766, 769–75, 233 N.W.2d 372, 374–76 (1975) (same). *But see Turpin v. Sortini,* 31 Cal.3d 220, 643 P.2d 954, 182 Cal.Rptr. 337 (1982) (permitting recovery of medical expenses by child).