C.S., Plaintiff and Appellant,

v.

Norman **NIELSON**, M.D.,
Defendant and Appellee.

No. 870039.

Supreme Court of Utah.

Dec. 6, 1988.

Jay V. Barney, Phillip B. Shell, Murray, for plaintiff and appellant.

J. Anthony Eyre, J. Mark Whimpey, Salt Lake City, for defendant and appellee.

HALL, Chief Justice:

The United States District Court for the District of Utah certified two questions of law to this Court under rule 41 of our Court rules.[1] The parties to the pending federal court action have submitted briefs setting forth their positions on these certified questions:

1. Does a claim for "wrongful pregnancy" resulting in the birth of a normal, healthy child as a result of an unsuccessful sterilization procedure performed by a physician give rise to a tort claim for damages under the laws of the State of Utah?

2. In the event a tort claim for "wrongful pregnancy" is recognized by the laws of the State of Utah, what is the appropriate measure of damages?

## I. Facts

The facts accompanying the certified questions indicate that defendant performed a tubal ligation procedure (a severance of the fallopian tubes for sterilization) on plaintiff.[2] Subsequently, plaintiff became pregnant and gave birth to a normal and healthy child. Plaintiff now contends that defendant was negligent in not informing her that the procedure was not "absolute in nature" and that alternative sterilization procedures were available with varying success rates. Plaintiff's assertion of damages includes claims for medical expenses incurred during her pregnancy and the birth of the child, medical expenses

---

**1.** Rule 41 of the Rules of the Utah Supreme Court in pertinent part provides:

The Utah Supreme Court may in its discretion answer a question of Utah law certified to it by a court of the United States when requested to do so by such certifying court acting in accordance with the provisions of this rule, but only if the state of the law of Utah applicable to a proceeding before the certifying court is uncertain and answering the certified question will not unduly interfere with the

Utah Supreme Court's regular functioning or be inconsistent with the timely and orderly development of the decisional law of the state.

**2.** We agree with the Supreme Court of West Virginia that "[b]ecause of the emotional, moral, and philosophical implications" inherent in cases such as this one, styling the case using the plaintiff's initials will "help to preserve the sanctity of the famil[y] involved." *James G. v. Caserta*, 332 S.E.2d 872, 874 n. 1 (W.Va.1985).

involved in having a hysterectomy performed subsequent to the birth of the child, "emotional trauma" during and after the pregnancy because of her concerns that the child may inherit "plaintiff's psychiatric problems," pain and suffering, and the costs of "rearing an unplanned child." The only issues before us are whether Utah recognizes this cause of action and, if so, the extent of the recoverable damages.

## II. Nature of the Action

Initially, "wrongful pregnancy" must be distinguished from the related claims of "wrongful birth" and "wrongful life." "Wrongful pregnancy," or "wrongful conception" as it is occasionally termed, refers to those cases where parents bring a claim on their own behalf for the monetary and emotional damages they suffered as a result of giving birth to a normal and healthy but unplanned and unwanted child. Such actions are usually based upon a negligently performed or counseled sterilization procedure or abortion, or negligence in preparing or dispensing a contraceptive prescription.[3]

"Wrongful birth," on the other hand, refers to the cause of action whereby parents claim they would have avoided conception or terminated an existing pregnancy by abortion but for the negligence of those charged with, among other things, prenatal testing or counseling as to the likelihood of giving birth to a physically or mentally impaired child.[4] "Wrongful life" is the corresponding action by or on behalf of an impaired child alleging that but for the medical professional's negligence, the child would not have been born to experience the pain and suffering associated with his or her affliction or impairment.[5]

Given these distinctions, the instant case is correctly viewed as involving a wrongful pregnancy cause of action. A vast majority of jurisdictions recognize that a cause of action for wrongful pregnancy exists in tort.[6] Courts essentially view wrongful pregnancy actions as indistinguishable from ordinary medical malpractice actions where a plaintiff alleges a physician's breach of duty and injury resulting therefrom.[7] Indeed, much of the analytical reasoning utilized in these cases revolves around the fact that if the physician has

---

3. See Continental Casualty Co. v. Empire Casualty Co., 713 P.2d 384, 392 (Colo.App.1985); Siemieniec v. Lutheran Gen. Hosp., 117 Ill.2d 230, 237, 111 Ill.Dec. 302, 307, 512 N.E.2d 691, 696 (1987); Johnston v. Elkins, 241 Kan. 407, 410–11, 736 P.2d 935, 938 (1987); Smith v. Gore, 728 S.W.2d 738, 741 (Tenn.1987), and cases cited therein (birth of normal child resulting from failed abortion); Miller v. Johnson, 231 Va. 177, 182, 343 S.E.2d 301, 304 (1986), and cases cited therein; see also W. Prosser & W. Keaton, Torts § 55, at 372–73 (5th ed. 1984).

4. See Siemieniec, 117 Ill.2d at 235–36, 111 Ill. Dec. at 306, 316, 512 N.E.2d at 695, 705, and cases cited therein ("The courts which have considered wrongful birth claims have been almost unanimous in their recognition of a cause of action against a physician or other health-care provider where it is alleged that but for the defendants' negligence the parents would have terminated the congenitally or genetically defective fetus by abortion."). Some courts have confused actions for wrongful birth and wrongful pregnancy. See, e.g., Szekeres ex rel. Szekeres v. Robinson, 102 Nev. 93, 97–98, 715 P.2d 1076, 1079 (1986); Beardsley v. Wierdsma, 650 P.2d 288, 289–90 (Wyo.1982).

5. See Siemieniec, 117 Ill.2d at 236–37, 111 Ill. Dec. at 306, 512 N.E.2d at 695, and cases cited

therein; see also Bruggeman ex rel. Bruggeman v. Schimke, 239 Kan. 245, 249, 718 P.2d 635, 638–39 (1986), and cases cited therein ("The majority of American jurisdictions have refused to recognize an action for wrongful life."). One of the concerns enumerated for general unwillingness to permit damages in the wrongful life action has been expressed as an impossibility "for the trier of fact to measure damages by placing the child in the position he would have been in had he not been born." Sherlock v. Stillwater Clinic, 260 N.W.2d 169, 172 n. 3 (Minn.1977) (citations omitted).

6. See Jackson v. Bumgardner, 318 N.C. 172, 179 & n. 2, 347 S.E.2d 743, 747–48 & n. 2 (1986), and cases cited therein.

7. Id. at 179, 347 S.E.2d at 747. Some courts that recognize a cause of action for wrongful pregnancy do so based in part upon the claim that the right to abstain from having children through the use of sterilization is a right recognized to be of federal constitutional dimensions. See, e.g., Morris v. Sanchez, 746 P.2d 184, 185–86 (Okla. 1987); id. at 191 & n. 4 (Opala, J., concurring in part and dissenting in part); infra note 47 and accompanying text. But see Johnston, 241 Kan. at 411, 736 P.2d at 939 (no constitutional issue involved in cause of action).

negligently performed a sterilization operation, he or she has breached a duty to the patient, and from a proximate cause standpoint, it is foreseeable that a child will be born and the parents will incur damages as a result of this negligence.[8] The court in *Boone v. Mullendore*[9] summarized this view:

> [I]n order to state a cause of action for negligence, the plaintiff must show that the defendant has a legal duty, that the defendant has breached that duty, that the defendant's breach proximately caused an injury, and that damages have resulted to the plaintiff. It is also the law in Alabama that a physician owes a duty to exercise reasonable care in the treatment of his or her patients. Therefore, if proven, the negligent misrepresentation of the nature of the surgery and/or such negligent performance of that surgery as would wrongfully cause a patient to become pregnant would be a breach of that duty.[10]

This statement and the rationale underlying the majority view are in accord with established principles of negligence theory[11] and our general law regarding proof of malpractice as set out in *Schmidt v. Intermountain Health Care, Inc.:*[12] "In order to recover for the negligence of a medical practitioner, a plaintiff must prove that (1) there was negligence and (2) the negligence was a proximate cause of the plaintiff's injury."[13] This view is also in keeping with the statutory requirements which a patient must prove in order to recover damages from a health care provider for failure to obtain informed consent. Utah Code Ann. § 78–14–5(1) (1987) lists these requirements:

> For a patient to recover damages from a health care provider in an action based upon the provider's failure to obtain informed consent, the patient must prove the following:
>
> (a) that a provider-patient relationship existed between the patient and health care provider; and
>
> (b) the health care provider rendered health care to the patient; and
>
> (c) the patient suffered personal injuries arising out of the health care rendered; and
>
> (d) the health care rendered carried with it a substantial and significant risk of causing the patient serious harm; and
>
> (e) the patient was not informed of the substantial and significant risk; and
>
> (f) a reasonable, prudent person in the patient's position would not have' consented to the health care rendered after having been fully informed as to all facts relevant to the decision to give consent. In determining what a reasonable, prudent person in the patient's position would do under the circumstances, the trier of fact shall use the viewpoint of the patient before health care was provided and before the occurrence of any personal injuries alleged to have arisen from said care; and
>
> (g) the unauthorized part of the health care rendered was the proximate cause of personal injuries suffered by the patient.[14]

■ Defendant, however, argues that plaintiff's claim is barred by Utah Code Ann. §§ 78–11–23 through –25 (1987). We disagree. Those sections provide:

> 78–11–23. Right to life—State policy.
>
> The Legislature finds and declares that it is the public policy of this state to encourage all persons to respect the right to life of all other persons, regardless of age, development, condition or dependency, including all handicapped persons and all unborn persons.

---

8. *See, e.g., James G.,* 332 S.E.2d at 876.

9. 416 So.2d 718 (Ala.1982).

10. *Id.* at 720 (citations omitted).

11. *See generally Weber ex rel. Weber v. Springville,* 725 P.2d 1360, 1363 (Utah 1986) (elements of negligence action).

12. 635 P.2d 99 (Utah 1981).

13. *Id.* at 101 (citations omitted).

14. *See also Burton v. Youngblood,* 711 P.2d 245, 249 (Utah 1985) (application of Utah Code Ann. § 78–14–5(1)).

78–11–24. Act or omission preventing abortion not actionable.

A cause of action shall not arise, and damages shall not be awarded, on behalf of any person, based on the claim that but for the act or omission of another, a person would not have been permitted to have been *born alive but would have been aborted.*

78–11–25. Failure or refusal to prevent birth not a defense.

The failure or refusal of any person to prevent the *live birth* of a person shall not be a defense in any action, and shall not be considered in awarding damages or child support, or in imposing a penalty, in any action.

(Emphasis added.) In arguing that this legislation precludes wrongful pregnancy causes of action, defendant mistakes the plain language of the statutes as well as the nature of plaintiff's claim.

The plain language of the legislation evidences that it seeks to address so-called wrongful life and wrongful birth actions and issues. As noted above, these terms are descriptive titles for claims made by deformed or impaired children and their parents, respectively, against physicians or other health care providers for negligent medical treatment or advice which, in words similar to those in the instant statutes, deprived the parents of the opportunity of deciding to prevent the *live birth* by choosing *to abort* a deformed or impaired fetus.[15]

Such language emphasizes the critical distinction between the types of claims sought to be precluded by the Utah statutes in question and the claim alleged in the instant case. Here, plaintiff sought a means to avoid pregnancy itself. Indeed, the injury she claims resulted from the fact that she became pregnant allegedly due to her physician's negligent counseling re-

garding a surgical procedure designed to prevent her from being able to conceive. Clearly, "[a] person's decision *not to conceive a child* and to undergo surgical sterilization should not be confused with one's decision *to abort a child already conceived.*"[16] In order for us to adopt defendant's view, we must ignore established and proven principles of tort law as well as the fact that in this case and others like it, it is not the birth or life of the child, but rather "the *pregnancy* [of the mother] *as a medical condition* that gives rise to compensable damages and completes the elements for a claim of negligence."[17] This we will not do.

Furthermore, to disregard the plain language and object of the statutes and hold as defendant urges us to do would create the concerns noted by the court in *Johnston v. Elkins:*[18]

The failure to recognize a cause of action against a physician who negligently performs surgical sterilization procedures would be a grant of absolute immunity to a physician whose negligence results in injury to the patient. We decline to grant such immunity. We see no reason why a physician who performs such surgery should be held to a lesser standard of care than a physician or surgeon who performs any other surgical procedure. Such a ruling could lead to a decrease in the standard of care, and would leave victims of professional negligence without a remedy.[19] A physician who assumes responsibility for a sterilization procedure at the request of a patient assumes a professional duty to render appropriate service, including testing and advice regarding the procedure, exercising the same standard of care applicable to other members of the medical profession in the community. A physi-

---

**15.** *See Jackson,* 318 N.C. at 180, 347 S.E.2d at 748; *see also supra* notes 4–5 and accompanying text. In deciding the issues presented in this case, we do not rule upon the constitutionality of Utah Code Ann. §§ 78–11–23 through –25.

**16.** *Morris,* 746 P.2d at 191 (Opala, J., concurring in part and dissenting in part) (emphasis in original).

**17.** *Jackson,* 318 N.C. at 181, 347 S.E.2d at 748 (some emphasis added).

**18.** 241 Kan. 407, 736 P.2d 935.

**19.** *See generally* Utah Const. art I, § 11.

cian is not required to guarantee the success of the procedure. Failure of the physician to achieve success does not automatically indicate negligence. He or she is only required to exercise the required standard of care during the surgery and in later attempting to verify the success or failure of the procedure and to appropriately advise the patient. Immunizing physicians from liability for negligence in this area would be contrary to public policy, and we decline to do so. We simply hold such physicians to the standard of care required of all members of the same school of medicine in the community in which they practice. Such a physician is answerable only if negligence in the performance of the services is established by proof.[20]

In contrast, acknowledging the cause of action for wrongful pregnancy and permitting the plaintiffs to recover damages which they prove are the natural, probable, and direct consequences of professional negligence neither contravenes the policy of placing high value on human life [21] nor necessarily encourages increased litigation in this area. Indeed, since such claims are generally limited to negligent and unsuccessful sterilization procedures or negligent post-operative procedures and/or counseling, it appears unlikely that there will be great proliferation of the same. At any rate, "the potential for some increase in litigation cannot justify refusal to recognize a valid cause of action." [22]

In view of the authority and rationale noted above, we conclude that an action based on wrongful pregnancy is a valid cause of action in this state and therefore answer the first certified question in the affirmative.

### III. Nature of Damages

The remaining certified question requests that we specify the damages that are recoverable in a wrongful pregnancy action. Plaintiff seeks recovery for the medical expenses incurred during her pregnancy and the birth of the child and in having a hysterectomy performed subsequent to the birth of the child. In addition, plaintiff seeks damages to compensate for emotional pain and suffering as well as emotional trauma during and after the pregnancy. Her final claim is for the anticipated costs of rearing and educating a healthy child.

A majority of courts that have examined the damages issue in the context of a wrongful pregnancy cause of action have ruled that most resulting damages may be recovered except child-rearing costs for a normal and healthy child.[23] Awarding these initial (non-child-rearing) damages is likewise congruous with our cases concerning the recovery of damages in negligent malpractice actions. Indeed, in *Nixdorf v. Hicken,*[24] we noted that damages which may be shown to follow as a proximate cause of the negligence include reasonable charges for discovery and repair of any resultant injury and monetary compensation for mental anguish.[25] Applying this general rule and principles involved in the majority view to the factual scenario of this case, we now conclude that the following damages are recoverable, if proven: (1) any medical and hospital expenses incurred as a result of the physician's negligence, including the costs of the initial unsuccessful sterilization operation, prenatal care, childbirth, postnatal care, and any increased

**20.** 241 Kan. at 411, 736 P.2d at 939; *see also Wilczynski v. Goodman,* 73 Ill.App.3d 51, 63, 29 Ill.Dec. 216, 225, 391 N.E.2d 479, 488 (1979) (court will not allow tortious conduct by a medical practitioner to be totally "uncompensable"); *Hickman v. Myers,* 632 S.W.2d 869, 871–72 (Tex.App.1982) ("It is in society's best interest to hold physicians to a standard of professional competence and impose liability when they are negligent in treating their patients.").

**21.** *See Johnston,* 241 Kan. at 411, 736 P.2d at 939.

**22.** *Id.*

**23.** *See, e.g., Byrd v. Wesley Medical Center,* 237 Kan. 215, 221–24, 699 P.2d 459, 465–67 (1985), and cases cited therein; *James G.,* 332 S.E.2d at 876–77, and cases cited therein.

**24.** 612 P.2d 348 (Utah 1980).

**25.** *Id.* at 355.

costs for a second sterilization operation if obtained; (2) compensation for the physical and mental pain [26] and damage suffered by the mother as a result of the pregnancy and subsequent childbirth and as a result of undergoing the sterilization operation(s) and during a reasonable recovery period after the above; (3) wages necessarily lost by the mother and/or the father of the child related to the above; and (4) punitive damages, if applicable.[27]

■ A more difficult issue is whether damages may also be recovered in wrongful pregnancy actions for the ordinary costs of raising a normal and healthy child. The courts that have addressed this issue have adopted one of four theories of recovery.

### A. No Recovery

A few cases are cited as holding that parents have no right to recover any damages or expenses for the performance of unsuccessful sterilization procedures because no damages resulted from the birth of a normal child.[28] At least one court has viewed the state of Nevada as currently adhering to this "absolutist position." [29]

### B. Full Recovery

The second view is that parents have a right to recover all the damages and all the expenses, including the costs of rearing the child, resulting from a failed sterilization procedure. Court's arguably adopting this view have based their decisions in part upon the fact that the right to limit procreation through contraception is within a constitutionally protected "zone of privacy" and that to exempt the defendants from liability for the foreseeable consequences of a failed sterilization procedure would infringe upon this fundamental right.[30] Cases recognizing this view are at best a distinct minority and are viewed by some courts as nonexistent.[31]

### C. The Benefits Rule

A more substantial number but still a minority of courts recognize that an uninterrupted chain of causation is established between the failure of a sterilization procedure due to a physician's negligence and the foreseeable consequences of the conception, pregnancy, and birth of a normal

---

26. *See generally Cruz v. Montoya,* 660 P.2d 723, 726 (Utah 1983); *Judd v. Rowley's Cherry Hill Orchards, Inc.,* 611 P.2d 1216, 1221 (Utah 1980).

27. We note parenthetically that we join with those courts which have rejected the notion that in order to obtain damages in a wrongful pregnancy cause of action, parents must have mitigated their damages by aborting or placing the child for adoption. *See, e.g., University of Ariz. v. Superior Court,* 136 Ariz. 579, 586 n. 5, 667 P.2d 1294, 1301 n. 5 (1983); *Sherlock,* 260 N.W. 2d at 176; *Morris,* 746 P.2d at 189; *Gore,* 728 S.W.2d at 751–52; *infra* note 53. Such alternatives are extreme and unreasonable. *Cf. Angelos v. First Interstate Bank of Utah,* 671 P.2d 772, 777 (Utah 1983) (mitigation of damages operates to prevent recovery for damages which could be avoided or minimized by *reasonable* means).

28. *See, e.g., Christensen v. Thornby,* 192 Minn. 123, 255 N.W. 620 (1934); *Ball v. Mudge,* 64 Wash.2d 247, 391 P.2d 201 (1964); *Beardsley,* 650 P.2d at 290 (citing *Shaheen v. Knight,* 11 Pa.D. & C. 41 (1957)); *see also* W. Prosser & W. Keaton, *Torts* § 55, at 372 (5th ed. 1984) (early decisions denied recovery reasoning that benefits of having healthy child outweighted detriments as matter of law).

29. *See Gore,* 728 S.W.2d at 742 (citing *Szekeres,* 102 Nev. 93, 715 P.2d 1076). Although denying recovery in *Szekeres,* the Nevada court recognized:

> [I]f a physician or someone else is found to have contracted to prevent a pregnancy from occurring, certainly it was within the contemplation of the contracting parties that failure to carry out the process in the manner promised would result in an award, at least, of the costs of medical, surgical and hospital care associated with the failed surgery. In such a case damages could be awarded in accordance with what was contemplated by the parties at the time the contract was made.

102 Nev. at 98, 715 P.2d at 1079 (citation omitted).

30. *See Gore,* 728 S.W.2d at 742–43, and cases cited therein; *Beardsley,* 650 P.2d at 291 (citing *Cockrum v. Baumgartner,* 99 Ill.App.3d 271, 273, 54 Ill.Dec. 751, 753, 425 N.E.2d 968, 970 (1981), *rev'd,* 95 Ill.2d 193, 69 Ill.Dec. 168, 447 N.E.2d 385, *cert. denied,* 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983); *see also Boone,* 416 So.2d at 721 (California follows the full recovery rule).

31. *See, e.g., Byrd,* 237 Kan. at 218, 699 P.2d at 462–63; *Morris,* 746 P.2d at 185 n. 2; *Miller,* 231 Va. at 186 n. 2, 343 S.E.2d at 306 n. 2.

child,[32] and thus

it must be recognized that [rearing] costs are a direct financial injury to the parents, no different in immediate effect than the medical expenses resulting from the wrongful conception and birth of the child. Although public sentiment may recognize that to the vast majority of parents the long-term and enduring benefits of parenthood outweigh the economic costs of rearing a healthy child, it would seem myopic to declare today that those benefits exceed the costs as a matter of law.[33]

Courts adopting this view, known as the "benefits rule," hold that parents have a right to recover all damages incurred and expenses resulting from the birth of an unplanned child, subject to having such amounts offset by the pecuniary and/or nonpecuniary benefits which parents will experience from their parental relationship with a normal and healthy child.[34] Section 920 of the Restatement (Second) of Torts at page 509 (1979) has been used to support this view. That section provides:

When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.[35]

One of the leading cases citing the Restatement and supporting the benefits rule is *University of Arizona v. Superior Court*.[36] Therein, the Arizona Supreme Court noted that courts which prohibit the recovery of child-rearing costs (the "majority rule," *infra* pages 513–516) in wrongful

pregnancy actions give various reasons for not adopting the benefits rule. For clarity, we quote at length from that court's opinion:

Some [majority rule] cases base their decision on the speculative nature of the necessity to assess "such matters as the emotional affect [sic] of a birth on siblings as well as parents, and the emotional as well as pecuniary costs of raising an unplanned and, perhaps, an unwanted child in varying family environments." We think, however, that juries in tort cases are often required to assess just such intangible factors, both emotional and pecuniary, and see no reason why a new rule should be adopted for wrongful pregnancy cases. Another reason given for the strict [majority] view is the argument that the benefits which the parents will receive from having a normal, healthy child outweigh any loss which the parents might incur in rearing and educating that child. No doubt this is true in many cases, but we think it unrealistic to assume that it is true in all cases. We can envision many situations in which for either financial or emotional reasons, or both, the parents are simply unable to handle another child and where it would be obvious that from either an economic or emotional perspective—or both—substantial damage has occurred.

A third basis for the strict [majority] rule is the argument that the "injury is out of proportion to the culpability of the [wrongdoer]; and that the allowance of recovery would place too unreasonable a burden upon the [wrongdoer], since it would likely open the way for fraudulent

---

**32.** *Gore,* 728 S.W.2d at 743.

**33.** *Sherlock,* 260 N.W.2d at 175; *see also University of Ariz.,* 136 Ariz. at 583–85, 667 P.2d at 1299–1300; *Fulton–Dekalb Hosp. Auth. v. Graves,* 252 Ga. 441, 443–44, 314 S.E.2d 653, 656 (1984) (Gregory, J., dissenting); *Morris,* 746 P.2d at 192 (Opala, J., concurring and dissenting).

**34.** *See University of Ariz.,* 136 Ariz. at 584, 667 P.2d at 1299, and cases cited therein; *Byrd,* 237 Kan. at 219–21, 699 P.2d at 463, 465, and cases cited therein.

**35.** The benefits rule has been criticized for failing to literally comply with the Restatement view limiting the allowable offset to monetary ("same interest") benefits resulting from the birth of the unplanned child, *see, e.g., University of Ariz.,* 136 Ariz. at 588, 667 P.2d at 1303–04 (Gordon, Vice C.J., concurring and dissenting); *Fulton–Dekalb,* 252 Ga. 441, 444, 314 S.E.2d 653, 655 (1984). *But see University of Ariz.,* 136 Ariz. at 584 n. 4, 667 P.2d at 1299 n. 4 (response to criticism).

**36.** 136 Ariz. 579, 667 P.2d 1294.

claims...." This, of course, is the hue and cry in many tort cases and in essence is no more than the fear that some cases will be decided badly. Undoubtedly, the system will not decide each case correctly in this field, just as it does not in any field, but here, as in other areas of tort law, we think it better to adopt a rule which will enable courts to strive for justice in all cases rather than to rely upon one which will ensure injustice in many.

The final basis for the strict [majority] rule is the one which gives this court greater pause than any of the others. It is well put by the Illinois Supreme Court in *Cockrum v. Baumgartner*.... The court used the following words to justify the denial of recovery of damages for the rearing and educating of the unplanned child:

"There is no purpose to restating here the panoply of reasons which have been assigned by the courts which follow the majority rule. * * * In our view, however, its basic soundness lies in the simple proposition that a parent cannot be said to have been damaged by the birth and rearing of a normal, healthy child.... [I]t is a matter of universally-shared emotion and sentiment that the intangible but all important, incalculable but invaluable 'benefits' of parenthood far outweigh any of the mere monetary burdens involved. Speaking legally, this may be deemed conclusively presumed by the fact that a prospective parent does not abort or subsequently place the 'unwanted' child for adoption. On a more practical level, the validity of the principle may be tested simply by asking any parent the purchase price for that particular youngster. Since this is the rule of experience, it should be, and we therefore hold that it is, the appropriate rule of law."

....

"We consider that on the grounds described, the holding of a majority of jurisdictions that the costs of rearing a normal and healthy child cannot be recovered as damages to the parents is to be preferred. One can, of course, in mechanical logic reach a different conclusion, but only on the ground that human life and the state of parenthood are compensible losses. In a proper hierarchy of values, the benefit of life should not be outweighed by the expense of supporting it. Respect for life and the rights proceeding from it are the heart of our legal system and, broader still, our civilization." [37]

After noting this rationale, the Arizona court rejected the majority view in favor of the benefits rule and concluded:

In most cases we could join in the "universally shared emotion and sentiment" expressed by the majority [rule] ..., but we do not believe we hold office to impose our views of morality by deciding cases on the basis of personal emotion and sentiment, though we realize we cannot and should not escape the effect of human characteristics shared by all mankind. However, we believe our function is to leave the emotion and sentiment to others and attempt to examine the problem with logic and by application of the relevant principles of law. In this case, we believe that the [majority rule] is based upon an emotional premise and ignores logical considerations.[38] While we recognize that in most cases a family can and will adjust to the birth of the child, even though they had not desired to have it, we must recognize also that there are cases where the birth of an unplanned child can cause serious emotional or economic problems to the parents....

....

In our view, the preferable rule is that followed by the courts which, although

37. *University of Ariz.*, 136 Ariz. at 582–83, 667 P.2d at 1297–98 (citations omitted).

38. Responding in part to this argument, the Georgia Supreme Court noted: "[W]e do not agree [with the Supreme Court of Arizona] that a strict application of principles of law will suffice to resolve the complicated questions that arise when the advance of science outstrips the development of ethical considerations." *Fulton–Dekalb*, 252 Ga. at 443, 314 S.E.2d at 655.

permitting the trier of fact to consider both pecuniary and non-pecuniary elements of damage which pertain to the rearing and education of the child, also require it to consider the question of offsetting the pecuniary and non-pecuniary benefits which the parents will receive from the parental relationship with the child. Some may fear that adoption of such a rule will permit juries to recognize elements of damage which, because of our private philosophy or views of ethics, we, as judges, believe should not be recognized. We feel, however, that the consensus of a cross section of the community on such important issues is better and more accurately obtained from the verdict of a jury than from the decision of any particular group of that community. A jury verdict based on knowledge of all relevant circumstances is a better reflection of whether real damage exists in each case than can be obtained from use of any abstract, ironclad rule which some courts would adopt and apply regardless of the circumstances of the particular case.

There may be those who fear that the rule which we adopt will permit the award of damages where no real injury exists. We feel this danger is minimized by giving weight and consideration in each case to the plaintiffs' reasons for submitting to sterilization procedures. Such evidence is perhaps the most relevant information on the question of whether the subsequent birth of a child actually constitutes damage to the parents....

It may be argued also that the rule which we adopt will have the unhappy effect of creating situations in which parents will testify to their feeling or opinion that the child is "not worth" the burden of having and rearing. Such testimony could be harmful if or when the child learns of it. "We are not convinced that the effect on the child will be significantly detrimental in every case, or even in most cases; ... we think the parents, not the courts, are the ones who must weigh the risk."

. . . .

In reaching our decision, we are influenced greatly by what we perceive to be the uniform rules of damages for all tort cases. One of the basic principles of damage law is the concept that a wrongdoer may be held liable for all damages which he may have caused and all costs which the victim may sustain as a result of the wrong....

We see no reason why ordinary damage rules, applicable to all other tort cases, should not be applicable to this situation.[39]

Other courts or judges agreeing with the Arizona view have also argued that (1) the benefits rule will more fully minimize substandard medical practice in the area of sterilization [40] and (2) allowing recovery for the costs of rearing the child will best protect the personal and constitutionally guaranteed privacy rights of procreation.[41] Notwithstanding all of the above arguments and rationales, jurisdictions adopting the benefits rule remain a distinct minority.

### D. Limited Damages View—The Majority Rule

Finally, of those courts that have addressed the issue of damages recoverable in a wrongful pregnancy cause of action, a majority have held that the ordinary child-rearing expenses for a healthy child cannot

---

**39.** *University of Ariz.,* 136 Ariz. at 584–86, 667 P.2d at 1298–1301 (footnotes and citations omitted).

**40.** *See, e.g., Sherlock,* 260 N.W.2d at 175; *Morris,* 746 P.2d at 192 (Opala, J. concurring and dissenting); *Beardsley,* 650 P.2d at 295 (Rose, C.J., concurring).

**41.** *See, e.g., Morris,* 746 P.2d at 191 (Opala, J., concurring and dissenting); *see also Boone,* 416

So.2d at 724 (Faulkner, J., concurring specially); *Cockrum,* 95 Ill.2d at 207, 69 Ill.Dec. at 175, 447 N.E.2d at 392 (Clark, J., dissenting); *Beardsley,* 650 P.2d at 295 (Rose, C.J., concurring); *supra* note 7. *But see Cockrum,* 95 Ill.2d at 202, 69 Ill.Dec. at 173, 447 N.E.2d at 390 (constitutional decisions cited appear irrelevant to issue of whether damages are recoverable for child-rearing costs).

be recovered.[42] Refusal to permit recovery of child-rearing costs has been based upon various considerations.

Some of the courts adopting this rule have based their rationale upon the speculative nature of child-rearing damages.[43] Others have expressed concern for the mental and emotional health of the child who may someday learn that he or she was not wanted and was reared by funds forcibly obtained from another person or business.[44] Some courts have ruled that the injury of rearing the child is too remote from the negligence caused and allowing such recovery would place an unreasonable burden upon the defendant while offering a windfall to the parents, who may enjoy the benefits of parenthood at the defendant's expense. Such burden, these courts indicate, is out of proportion to the culpability involved and will have a rampant and incontinent effect.[45] Additionally, it has been noted that allowing such damages would likely impinge upon the availability and costs of sterilization surgery while creating the possibility of new and protracted litigation and fraudulent claims.[46] Courts and judges have also concluded that the benefits rule incorrectly applies the Restatement principle which limits the damages

that can be offset to monetary benefits resulting from the birth of the unplanned child.[47] This conclusion has been supported by the observation that the benefits rule inconsistently allows rearing costs to be recovered without requiring consideration of the parents' failure to attempt mitigation.[48] Lastly, many courts have expressed the opinion that parents cannot be damaged by the birth and rearing of a normal, healthy child since the joy, companionship, and affection which such a child can provide are benefits that will inevitably outweigh the costs of rearing that child.[49] The Wyoming Supreme Court expressed this view in *Beardsley v. Wierdsma:*[50]

> We believe that the benefits of the birth of a healthy, normal child outweigh the expense of rearing a child. The bond of affection between child and parent, the pride in a child's achievement, and the comfort, counsel and society of a child are incalculable benefits, which should not be measured by some misplaced attempt to put a specific dollar value on a child's life.

> The benefit or offset concept smacks of condemnation law, where the trier of fact determines the value of the land taken by the condemnor. The trier of

42. *See supra* note 23.

43. *See, e.g., Coleman v. Garrison,* 349 A.2d 8, 12 (Del.1975); *McKernan v. Aasheim,* 102 Wash.2d 411, 419, 687 P.2d 850, 855 (1984).

44. *See, e.g., Byrd,* 237 Kan. at 217, 699 P.2d at 462, 465 ("'The benefits rule makes it to the parents' advantage to emphasize their problems with the child. It attacks the family unit. Under the benefits rule, a problem arises as to who shall control the money recovered, the parents ... or some special guardian to see that the money actually goes to the child,'" citations omitted.); *Miller,* 231 Va. at 185, 343 S.E.2d at 306.

45. *See, e.g., Byrd,* 237 Kan. at 221, 699 P.2d at 465 (citing *McKernan,* 102 Wash.2d 411, 687 P.2d 850); *Beardsley,* 650 P.2d at 292.

46. *See, e.g., University of Ariz.,* 136 Ariz. at 587, 667 P.2d at 1302 (Gordon, Vice C.J., concurring and dissenting); *Byrd,* 237 Kan. at 222, 699 P.2d at 465; *Beardsley,* 650 P.2d at 292.

47. *See, e.g., University of Ariz.,* 136 Ariz. at 588–89, 667 P.2d at 1303–04 (Gordon, Vice C.J., con-

curring and dissenting); *Morris,* 746 P.2d at 186–87; *supra* note 35.

48. *See, e.g., University of Ariz.,* 136 Ariz. at 588, 667 P.2d at 1303 (Gordon, Vice C.J., concurring and dissenting). In response to this issue, one author has noted that parents should not be forced to mitigate damages by choosing abortion or adoption. "They chose not to conceive a child. It is quite a different situation to ask a couple, once a child has been conceived, to abort, or to put the child up for adoption, indicating that if they failed to do either they would assume full responsibility of any and all costs of that child. If parents are confronted in such a situation with choices that they consider to be unenviable alternatives, they should not be precluded from recovering damages because they select the most desirable of these unpalatable choices." *Cockrum,* 95 Ill.2d at 207, 69 Ill.Dec. at 175, 447 N.E.2d at 392 (Clark, J., dissenting); *see also supra* note 27.

49. *See, e.g., Boone,* 416 So.2d at 722–23; *Byrd,* 237 Kan. at 221, 699 P.2d at 465 (citing *McKernan,* 102 Wash.2d 411, 687 P.2d 850).

50. 650 P.2d 288.

fact then determines the benefit that results to the land owner, which benefit is deducted from the original value to determine the proper award. If the concept of benefit or offset was applied to "wrongful birth" actions, we can conceive of the ridiculous result that benefits could be greater than damages, in which event someone could argue that the parents would owe something to the tort-feasors. We think that a child should not be viewed as a piece of property, with fact finders first assessing the expense and damage incurred because of a child's life, then deducting the value of that child's life.[51]

Similarly, in *Terrell v. Garcia*,[52] the court reasoned:

[A] strong case can be made that, at least in an urban society, the rearing of a child would not be a profitable undertaking if considered from the economics alone. Nevertheless, ... the satisfaction, joy and companionship which normal parents have in rearing a child make such economic loss worthwhile. These intangible benefits, while impossible to value in dollars and cents[,] are undoubtedly the things that make life worthwhile. Who can place a price tag on a child's smile or the parental pride in a child's achievement? Even if we consider only the economic point of view, a child is some security for the parents' old age. Rather than attempt to value these intangible benefits, our courts have simply determined that public sentiment recognizes that these benefits to the parents outweigh their economic loss in rearing and educating a healthy, normal child. We see no compelling reason to change such rule at this time.[53]

Finally, the Oklahoma Supreme Court recently noted:

If, as those jurisdictions allowing recovery for costs of raising an unplanned child agree, the benefits flowing from the life of an unplanned child must be allowed as an offset to the costs of raising the child, would we not then be required to allow, as an offset to the benefits from the life of a child recoverable as damages in a wrongful death action, the costs of raising the child which will not be incurred because of the child's death? Would we not then be faced with the necessity of considering the death of the child in terms of the benefit bestowed upon the parents? This, in essence, is the heart of the matter before us. To consider the costs of raising an unplanned child as an element of damages incurred, we are required to embrace the logical conclusion that the nonexistence of that child would be a benefit. This we cannot do.[54]

While we are not persuaded by all of these enumerated rationales in support of the majority rule, the reasons for denying rearing costs are more convincing than the reasons for "abstractly applying a rule not suited for the circumstances in this character of case."[55]

Moreover, we find persuasive the statement of the Washington Supreme Court that the benefits rule cannot be applied because

it is impossible to establish with reasonable certainty whether the birth of a particular healthy, normal child damaged its parents. Perhaps the costs of rearing and educating a child could be determined through use of actuarial tables or similar economic information. But whether these costs are outweighed by the emotional benefits which will be conferred by that child cannot be calculated. The child may turn out to be loving,

51. *Id.* at 293.

52. 496 S.W.2d 124 (Tex.Civ.App.1973), *cert. denied*, 415 U.S. 927, 94 S.Ct. 1434, 39 L.Ed.2d 484 (1974).

53. *Id.* at 128 (citations omitted).

54. *Morris*, 746 P.2d at 187–88 (footnote omitted).

55. *Cockrum*, 95 Ill.2d at 203, 69 Ill.Dec. at 173, 447 N.E.2d at 390. *But see Acculog, Inc. v. Peterson*, 692 P.2d 728, 731 (Utah 1984) (all damages, whether special or general, which are causally connected to a party's tortious actions are generally recoverable).

obedient and attentive, or hostile, unruly and callous. The child may grow up to be President of the United States, or to be an infamous criminal. In short, it is impossible to tell, at an early stage in the child's life, whether its parents have sustained a net loss or net gain.[56]

This rationale has also been adopted by the Delaware Supreme Court, which noted:

First, as to the legal concept, it is a settled Delaware law that recovery may not be had for damages which are speculative or conjectural. And that applies to any attempt to measure the value of a human life against its cost. A child is born—how can it be said within the ambit of legal predictability that the monetary cost of that life is worth more than its value? We recognize that a few courts, approaching the problem in clinical terms, have applied a "balancing test" which, presumably, permits a jury to say that a life has been weighed and found wanting and thus the parents have been "damaged." We respect the efforts of other [c]ourts to provide a remedy under the circumstances but it seems to us that that kind of judgment, if appropriate at all in an American Court of law, might be applied at the end of a life, after it has been lived and when the facts can be identified. But, in our view, any attempt to apply it at birth can only be an exercise in prophesy, an undertaking not within the specialty of our fact-finders.[57]

Having thus considered the views and arguments advanced in support of each of the recovery approaches, and notwithstanding the positions taken by Justices Durham and Zimmerman which would broaden the measure of damages to include the costs of rearing the child, the Court concludes that the majority rule applies in this jurisdiction,

and we acknowledge it. In wrongful pregnancy actions, the projected costs of rearing a normal, healthy child may not be recovered.

Our decision is limited to the narrow issues presented, and as such, we do not address other issues and questions which might be raised in this sensitive area of the law.[58]

The parties are to bear their own costs.

STEWART, J., concurs.

DURHAM, Justice (concurring and dissenting):

In view of the authorities and rationale presented by the majority opinion, I concur that an action based on wrongful pregnancy is a valid cause of action in this state. However, I do not agree with the majority's limitation on recoverable damages. Instead, I would hold that damages should be assessed under a "benefits rule" analysis, on a case-by-case basis, to determine the extent of any substantial negative impact suffered by plaintiff and her family resulting from a subsequent childbirth. This approach would promote justice by permitting consideration of the impact "accruing to parents in differing circumstances" of defendants' negligence. *Boone v. Mullendore*, 416 So.2d 718, 726 (Ala.1982) (Faulkner, J., specially concurring).

I find the majority opinion's rationale for limiting damages to be unpersuasive given the arguments favoring the "benefits rule." I also disagree with the majority's conclusion that damages to a parent from raising a child to majority are unascertainable. In making these assertions, the majority ignores the realities of the circumstances in which this kind of case tends to arise. *See generally Custodio v. Bauer*, 251 Cal. App.2d 303, 59 Cal.Rptr. 463 (Cal.Ct.App.

---

56. *McKernan*, 102 Wash.2d at 419–20, 687 P.2d at 855 (citations omitted); *cf. Atkin, Wright & Miles v. Mountain States Tel.*, 709 P.2d 330, 336 (Utah 1985) ("There ... must be evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages."); *Highland Const. Co. v. Union Pacific R.R. Co.*, 683 P.2d 1042, 1045 (Utah 1984) ("[D]amage must be established by substantial evidence and not by conjecture.").

57. *Coleman*, 349 A.2d at 12 (footnotes and citations omitted); *see also Miller*, 231 Va. at 187, 343 S.E.2d at 306, and cases cited therein; *James G.*, 332 S.E.2d at 878.

58. *See, e.g., Boone*, 416 So.2d at 723.

1967) (family with nine children and of limited financial means sought to prevent further diminution of family resources); *Stills v. Gratton,* 55 Cal.App.3d 698, 127 Cal. Rptr. 652 (Cal.Ct.App.1976) (unmarried, unemployed, part-time art student with self-described emotional problems frightened at prospect of having a child); *Sherlock v. Stillwater Clinic,* 260 N.W.2d 169 (Minn.1977) (following birth of seventh child, parents sought to ensure that their family would grow no larger); *Hartke v. McKelway,* 707 F.2d 1544 (D.C.Cir.), *cert. denied,* 464 U.S. 983, 104 S.Ct. 425, 78 L.Ed.2d 360 (1983) (plaintiff with history of gynecological and pregnancy-related emotional problems); *Ochs v. Borrelli,* 187 Conn. 253, 445 A.2d 883 (1982) (following births of two children with orthopedic defects, plaintiff with history of miscarriage and ovarian surgery sought to prevent subsequent pregnancy); *University of Ariz. Health Sciences Center v. Superior Court,* 136 Ariz. 579, 667 P.2d 1294 (1983) (having three children, plaintiffs sought to limit family size for financial reasons); *Jones v. Malinowski,* 299 Md. 257, 473 A.2d 429 (1984) (economic factors motivate plaintiffs to limit family size after having three children, each born with complications); *see also Troppi v. Scarf,* 31 Mich. App. 240, 187 N.W.2d 511 (1971) (plaintiffs of limited economic means, using oral contraceptives to limit family size, receive tranquilizers instead of birth control pills). Furthermore, I find the majority's use of a limited damages rule inconsistent with fundamental principles of tort law. Generally, when breach of a legally recognized duty arises, the tort-feasor is liable in damages. *See Acculog, Inc. v. Peterson,* 692 P.2d 728, 731 (Utah 1984). It is axiomatic that when the principles of tort law are not followed, the salutary effect of those principles on the standard of care in the community may be diminished. *See Johnston v. Elkins,* 241 Kan. 407, 411, 736 P.2d 935, 939 (1987).

It is true, as the majority observes, that in an action for wrongful pregnancy, "failure of the physician to achieve success does not automatically indicate negligence." *Johnston,* 736 P.2d at 939. Moreover, physicians should not be guarantors of a sterilization procedure's success. *See id.* The issue is usually not negligence in the performance of a sterilization procedure or contraceptive treatment, but rather a failure to inform the patient about pregnancy risks remaining after the procedure or the treatment. In cases where sterilization is intentionally sought to avoid a specific harm and the physician in question is fully informed about the harm to be avoided and then fails to take reasonable measures to avert that harm when it is foreseeable, that physician should be liable in damages. This view is consistent with the majority's decision that " '[a] physician who assumes the responsibility for a sterilization procedure at the request of a patient assumes a professional duty to render appropriate service, including testing and advice regarding the procedure, exercising the same standard of care applicable to other members of the medical profession in the community.' " *See id.*

Therefore, it logically follows that a negligent performance of that duty which results in an avoidable, foreseeable injury must be compensable in damages. Any artificial limitation on the damages recoverable would work to immunize the tort-feasor from the economic consequences of his or her negligent conduct and to shift those consequences to the innocent victim. Such judicially imposed immunity is contrary to both the compensatory and the deterrent goals of tort law.

Recovery for child-rearing costs where a negligently performed sterilization has a substantial negative impact on the family is in the interest of "greater justice." *See Hartke,* 707 F.2d at 1552. Some courts have advanced the notion that recovery of child-rearing costs offends a fundamental societal premise that the birth of a child is always a benefit. *See, e.g., Cockrum v. Baumgartner,* 95 Ill.2d 193, 69 Ill.Dec. 168, 447 N.E.2d 385, *cert. denied,* 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983) (public policy considerations dictate that a healthy child's birth is a benefit to parents); *Beardsley v. Wierdsma,* 650 P.2d 288 (Wyo.1982) (bond of affection between par-

ent and child should not be measured by some misplaced attempt to assess a dollar value on child's life); *Public Health Trust v. Brown,* 388 So.2d 1084 (Fla.Dist.Ct.App. 1980) (requiring negligent physician to pay such costs would impose an unreasonable burden on the tort-feasor because the costs were out of proportion to the culpability). However, as the majority observes, permitting recovery of damages which are proven to be the "natural, probable and direct consequence of professional negligence ... does not contravene the policy of placing a high value on human life." *Johnston,* 736 P.2d at 939; *see also University of Ariz.,* 667 P.2d at 1298–99 (cases should not be decided on sentiment alone—many situations exist where for economic or emotional reasons or both, it is obvious that recoverable damage has occurred); *Ochs,* 445 A.2d at 885–86 (no inconsistency with public policy that parental pleasure softens but does not eradicate economic reality).

Jurisdictions which recognize wrongful pregnancy as a cause of action and allow recovery for child-rearing costs premise damages on the fact that a resultant birth may cause hardship to family members due to the diminution of family resources rather than the birth itself. *See, e.g., University of Ariz.,* 667 P.2d at 1294; *Stills,* 55 Cal.App.3d at 698, 127 Cal.Rptr. 652; *Ochs,* 445 A.2d at 883; *Malinowski,* 473 A.2d at 429; *Sherlock,* 260 N.W.2d at 173. As the Maryland Supreme Court succinctly summarized: "Parents seek [these] damages, not because they do not love and want to keep the unplanned child, but because the direct, foreseeable and natural consequences of the physician's negligence has [sic] forced burdens upon [the parents] which they sought to avoid ... by submitting to sterilization." *Malinowski,* 473 A.2d at 436.

In this light, recovery for child-rearing expenses is, in my view, appropriate when a negligently caused pregnancy forces upon parents substantial economic, emotional, or physical hardships which they sought to avoid. *See, e.g., id.; University of Ariz.,* 667 P.2d at 1300–01; *Ochs,* 445 A.2d at 883–84; *Hartke,* 707 F.2d at 1553–54 (applying District of Columbia law).

*But see Flowers v. District of Columbia,* 478 A.2d 1073 (App.D.C.1984) (adopting the limited damages rule). Regarding the appropriateness of a recovery for child-rearing expenses resulting from pregnancy, the Arizona Supreme Court stated: "[I]n most cases, the family can and will adjust to the birth of a child, even though they had not desired to have it[; however,] we must recognize ... that there are cases where the birth of an unplanned child can cause serious emotional or economic problems to the parents." *University of Ariz.,* 667 P.2d at 1299. The following is illustrative of this concept:

A couple privileged to be bringing home the combined income of a dual professional household may well be able to sustain and cherish an unexpected child. But I am not sure the child's smile would be the most memorable characteristic to an indigent couple, where the husband underwent a vasectomy or the wife underwent a sterilization procedure, not because they did not desire a child, but rather because they faced the stark realization that they could not afford to feed an additional person, much less clothe, educate and support a child when that couple had trouble supporting one another. The choice is not always giving up personal amenities in order to buy a gift for the baby; the choice may only be to stretch necessities beyond the breaking point to provide for a child that the couple had purposely set out to avoid having.

*Cockrum,* 69 Ill.Dec. 168, 177, 447 N.E.2d 385, 394 (Clark, J., dissenting).

The foreseeable injury associated with a negligently caused pregnancy need not be solely economic. There are "many situations in which for either financial or emotional reasons, or both, the parents are simply unable to handle another child and where it would be obvious that from either an economic or emotional perspective—or both—substantial damage has occurred." *University of Ariz.,* 667 P.2d at 1298; *see also Ochs,* 445 A.2d at 886. It is logical, therefore, that where pregnancy may cause substantial emotional, psychological, or

physical stress to family resources, the resulting injury merits compensation. In these cases, compensation for child-rearing expenses will be appropriate.

I fully agree that a healthy child's birth does, in the usual circumstance, confer many benefits upon its family. However, these benefits may in a very real sense be offset by hardships that the parents sought to avoid. Thus, the extent of any resulting injury will vary depending on the particular family's circumstances and expectations. *See Cockrum,* 69 Ill.Dec. at 174, 447 N.E. 2d at 391 (Clark, J., dissenting). In my view, parental planning of familial resources, motivated by their aspirations for their then-existing children's futures, is an important consideration. It is conceivable that some parents may limit their family size in order to provide their children with specific opportunities for travel or education. Therefore, the most relevant consideration for ascertaining actual injury is the parents' motivation for seeking the sterilization procedure. *See Malinowski,* 473 A.2d at 434; *see also Hartke,* 707 F.2d at 1553; *Troppi,* 187 N.W.2d at 518–19 (consequences of birth from failure of contraceptives contingent on the purposes and circumstances of parents—comparing unmarried female college student with honeymooning newlyweds).

After consideration of parental motivations for avoiding pregnancy, it is conceivable that many wrongful pregnancy cases will be adequately remedied by the majority rule. However, it is just as conceivable that there are many cases wherein pregnancy and birth will constitute a substantial negative impact on the family. In these cases, the limited damages rule advanced by the majority would not work an equitable result.

In determining whether child-rearing expenses are appropriate in a given case, the extent of the negative impact on the family must be measured.

> We tend to agree that a factfinder should place great weight on a couple's reason for undergoing sterilization in deciding whether the subsequent birth of a child, on balance, constitutes damage to the

parents. [The] reason for departing from the usual view that childrearing is a positive experience is in effect a calculation of the way in which they anticipate the costs of childbirth to outweigh the benefits. That calculation, untainted by bitterness and greed, or by a sense of duty to a child the parents have brought into the world, is usually the best available evidence of the extent to which the [childbirth] has in fact been an injury to them.

*Hartke,* 707 F.2d at 1555.

Reflecting these sentiments, the Arizona Supreme Court stated:

> For example, where the parent sought sterilization in order to avoid the danger of genetic defect, the jury could easily find that the uneventful birth of a healthy, non-defective child was a blessing rather than a "damage." [In this light] such evidence should be admissible, and the rule which we adopt will allow the jury to learn all the factors relevant to the determination of whether there has been any real damage and, if so, how much.

*University of Ariz.,* 667 P.2d at 1300.

Thus, in view of the realities in which these cases arise, a case-by-case application of a "benefits rule" analysis is not merely necessary, but is required. The impact of a negligently caused pregnancy may differ dramatically according to a particular family's circumstances and aspirations. It must be emphasized that it is impossible to articulate a mechanistic test, as opposed to identifying an analytic approach. For this and the other reasons discussed above, a case-by-case approach to the determination of damages is the most practical.

The majority opinion maintains that damages are unascertainable because "it is impossible to tell, at an early stage in the child's life, whether its parents have sustained a net loss or net gain." *McKernan v. Aasheim,* 102 Wash.2d 411, 420, 687 P.2d 850, 855 (1984). To support this assertion, the majority utilizes the rationale that parents are either benefited or burdened by their child's future behavior, and because it is too speculative to determine this at a

child's birth, offset is impracticable. *See id.* I disagree. Child-rearing costs are not too speculative to deny their recovery under settled tort principles. *Malinowski*, 473 A.2d at 436.

We have held on other occasions that damages may be recovered even when they require juries to consider intangible values. *See, e.g., Jones v. Carvell*, 641 P.2d 105 (Utah 1982) (wrongful death); *Nelson v. Jacobsen*, 669 P.2d 1207 (Utah 1983) (alienation of affection). Moreover, in *Bastian v. King*, 661 P.2d 953 (Utah 1983), this Court stated:

> [I]t is generally recognized that some degree of uncertainty in the evidence of damages will not suffice to relieve a defendant from recompensing a wronged plaintiff. As long as there is some rational basis for a damage award, it is the wrongdoer who must assume the risk of some uncertainty. Where there is evidence of the fact of damage, a defendant may not escape liability because the amount of damage cannot be proved with precision.

*Id.* at 956 (citations omitted).

Furthermore, the assertion that child-rearing costs are too speculative to be recovered is inconsistent with the theory of damages in this particular cause of action. In wrongful pregnancy, damages are for "the diminution in the family [resources] that necessarily resulted in a hardship to the other members of the family." *Sherlock*, 260 N.W.2d at 173. I fail to see why economic data about family resources would be unavailable or unhelpful in these cases.

I agree that the offset of financial costs by the intangible benefits conferred on a family by a child may in some cases be unrealistic. *See Flowers*, 478 A.2d at 1081 (Ferren, J., dissenting). However, instead of prohibiting such damages altogether, I would allow recovery on a case-by-case basis under what I believe is a proper application of the benefits rule, using a standard of "substantial negative impact to the family."

First, the plaintiffs would have to demonstrate by a preponderance of the evidence that they elected sterilization for some important economic, personal, or therapeutic reason and that the subsequent childbirth has resulted in the substantial harm the parent sought to avoid by submitting to the procedure. *See, e.g., Flowers*, 478 A.2d at 1081 (Ferren, J., dissenting); *Ochs*, 445 A.2d at 884; *Sherlock*, 260 N.W.2d at 173. In order to discredit that assertion, the defending physician could inquire into the plaintiffs' financial situation and motives via discovery and cross-examination. *Flowers*, 478 A.2d at 1081 (Ferren, J., dissenting). For example, the "jury should be allowed to infer ... that a person of means could not credibly give economic reasons as the sole motive for sterilization." *Id.*

Second, as Judge Ferren wrote when dissenting in *Flowers:*

> The [plaintiff parent] must present expert evidence of anticipated reasonable childrearing costs attributable to the negligent sterilization. To be reasonable, these must be based on generally necessary, not elective expenditures. The physician may rebut that presentation by showing the [claimed] damages are not as great as alleged because certain kinds of proposed expenses should not be considered necessary [in light of the evidence presented] (e.g. private schools, music lessons) and also because the family can anticipate some calculable financial benefits from the child.... However, evidence of emotional benefit ("satisfaction, love, joy, and pride")—as distinguished from financial benefit—cannot be introduced to offset [any] financial injury. In [these cases] ... evidence that ... [the] child can be expected to provide emotional benefit is irrelevant, and the majority's concern about denigrating the child's value as a human being ... is misplaced.

478 A.2d at 1081 (citations omitted). The irrelevance of intangible emotional benefits in cases of this nature is underscored by the irony inherent in requiring juries to "credit" parents of an unplanned-for (but healthy) child with the economic value of the child's future life in the abstract. Notwithstanding Justice Zimmerman's charac-

terization of this approach as an "unadulterated" benefits rule for measuring damages, I believe that it would in practical application deprive most victims of this kind of tort of *any* recovery. Jurors will instead bring *their* subjective, philosophical, moral, and religious beliefs to the determination of the dollar value of a child's life, unrelated to any actual facts about the child or the life in question. I do not think that this is "fact finding" in any conventional sense, nor do I think that any jury is likely to find a "child's life" to be less valuable than *any* economic cost, burden, hardship, or sacrifice imposed upon its family. The net result, I believe, would be to permit a cause of action in these cases, but preclude any realistic likelihood of recovery.

The majority rule of recovery is not well suited for the diverse contexts and circumstances that arise in wrongful pregnancy cases. Using a benefits rule analysis, on a case-by-case basis, with a standard of "substantial negative impact," would provide fairness in cases where the majority rule will not. The majority rule in effect says to some families burdened by the harm and struggle which some unwanted pregnancies bring that they have no remedy despite the hardship and stress they may be condemned to undergo. Moreover, to the extent that physicians are encouraged by a liability rule to maintain a high standard of care in this area of practice, the limited recovery rule dilutes the liability rule's deterrent effect. Therefore, I dissent from the majority's holding on limited recovery.

ZIMMERMAN, Justice (concurring and dissenting):

I agree with much of the majority opinion; however, I depart from both the Chief Justice and Justice Durham on the damage measure. For that reason, I write.

First, I want to make it clear that I agree with the majority of the members of the Court that a tort action for wrongful pregnancy should be recognized in Utah and that such an action can arise from the birth of a healthy child. As the opinion of the Chief Justice notes, this cause of action has been recognized in the vast majority of jurisdictions. I also agree that the Utah Wrongful Life Act, Utah Code Ann. §§ 78–11–23 to –25 (1987) does not bar this cause of action. *See* Note, *Wrongful Birth and Wrongful Life: Analysis of the Causes of Action and the Impact of Utah's Statutory Breakwater,* 1984 Utah L.Rev. 833, 859. For that reason, we can postpone reaching the constitutionality of that act to another day. *See generally id.* at 862–63.

Second, with respect to the measure of damages available in such actions, I do not agree with the position of the Chief Justice or with that of Justice Durham. Because the malpractice claim here is analytically indistinguishable from any other malpractice claim, I see no reason to adopt some sort of truncated damages remedy as both the Chief Justice and Justice Durham propose. *See id.,* 1984 Utah L.Rev. at 854–56. The Chief Justice would limit damages by excluding any consideration of the costs of raising the child, despite the fact that these damages are clearly foreseeable. I think the recoverable damages should include all reasonably foreseeable harms, including the costs of raising the child. As nearly as I can determine, Justice Durham would permit recovery of child-rearing costs in some circumstances, but would amend what is generally referred to as the "benefits rule" by not permitting the jury to consider counterbalancing benefits that the parents might derive from bearing and raising the child. I would adopt the unadulterated "benefits rule" for measuring damages, which most closely approximates the general damages rule that if the tortfeasor has conferred benefits as well as detriments on the plaintiff, the benefits and detriments must be netted out in any award. Restatement (Second) of Torts § 920 (1979); 22 Am.Jur.2d *Damages* § 551 (1988).

The various possible rules and the justifications for adopting the straight benefits rule rather than the rules advanced by the Chief Justice and Justice Durham are described persuasively by the Arizona Supreme Court in *University of Arizona Health Sciences Center v. Superior Court,*

136 Ariz. 579, 667 P.2d 1294 (1983). The benefits rule allows

> recovery of all damages which flow from the wrongful act but requires consideration of the offset of benefits. Under this view, the trier of fact is permitted to determine and award all past and future expenses and damages incurred by the parent, including the cost of rearing the child, but is also instructed that it should make a deduction for the benefits that the parents will receive by virtue of having a normal, healthy child.

136 Ariz. at 582, 667 P.2d at 1297 (citations omitted).

The damage measures advanced by the Chief Justice and by Justice Durham are, in my view, the result of judges' imposing upon the tort law in a rather *ad hoc* fashion their personal moral and emotional judgments about the abstract benefits and detriments that accompany children, with the result that they have severely distorted the tort law remedies that should be available to those who have been injured as a result of malpractice. For the reasons discussed by the Arizona Supreme Court, among others, I cannot agree that this is appropriate. *See* 136 Ariz. at 582–84, 667 P.2d at 1298–99.

HOWE, Associate Chief Justice (dissenting):

I dissent. I would answer "no" to the first question certified to us. I would do this for the reasons enunciated by the Supreme Court of Nevada in *Szekeres ex rel. Szekeres v. Robinson*, 102 Nev. 93, 715 P.2d 1076 (1986), which held that the birth of a normal, healthy child is not a civil wrong for which the law will provide a remedy because there are no damages. This is true even if negligent or careless conduct on the part of a professional was found to have contributed to the eventual birth. The court noted that some jurisdictions recognize such a cause of action and stated:

> From our point of view what is overlooked in these decisions is the basic question of just what is the damage or the *"wrong"* to be legally redressed.

> The case involving the birth of a normal child is analytically distinguishable from an ordinary medical negligence action with its attendant "resulting injurious consequences," such as death, disability or other adverse iatrogenic consequences; and it should not be facilely assumed that childbirth is a "wrong" or the type of injurious consequence for which society *should,* through its courts, as a matter of public policy, give reparation.

> Many courts have taken for granted that normal birth is an injurious and damaging consequence and have disagreed only on the "how-much" part of such claims. We do not take the wrongness nor the injuriousness of the birth event for granted and say, to the contrary, that normal birth is not a wrong, it is a "right." It is an event which, of itself, is not a legally compensable injurious consequence even if the birth is partially attributable to the negligent conduct of someone purporting to be able to prevent the eventuality of childbirth.

*Szekeres,* 102 Nev. at 96–97, 715 P.2d at 1078 (footnotes omitted).

The Supreme Court of Kansas took a similar view in *Byrd v. Wesley Medical Center,* 237 Kan. 215, 699 P.2d 459 (1985), holding that as a matter of public policy, the birth of a normal, healthy child does not constitute a legal harm for which damages are recoverable. The court noted that wrongful death actions are recognized because of the great value we all place on human life and that it would be inconsistent to recognize actions for the wrongful birth or wrongful conception of a healthy child. See also to the same effect *Morris v. Sanchez,* 746 P.2d 184 (Okla.1987) (Hodges, J., concurring and dissenting).

I submit that it likewise should be the public policy of this state not to recognize such a cause of action. Our legislature in Utah Code Ann. § 78-11-23 (1987), while not addressing the precise issue before us, has by its declaration of public policy placed a high value on the right to be born and live. Yet, in the face of that declaration, this Court today recognizes a cause of

action which denigrates human life and awards damages for the birth of a healthy child. The Court's holding is an insidious attack on the family unit since the unwanted child will someday learn that his parents did not want him and in fact went to court to force someone else to pay for the medical and hospital costs attendant to his birth, the wages they lost when he was born, and the pain and suffering and "emotional trauma" of his mother. The emotional harm inflicted by this cruel knowledge will be carried by the child throughout his or her life. Who is going to compensate this unwanted child in damages for his "emotional trauma" in being born, through no fault of his own, to parents who did not want him and considered the advent of his birth not as a "blessed event," but as damage to them? Vice Chief Justice Frank X. Gordon in his opinion in *University of Arizona Health Sciences Center v. Superior Court,* 136 Ariz. 579, 586, 667 P.2d 1294, 1301 (1983), aptly pointed out that the prosecution of a wrongful pregnancy action requires that parents deny the worth of their child, thus placing their own values over those of the child.

If this same unwanted child were killed by the negligence of a third party, the parents would have a cause of action for wrongful death and would claim damages on account of his death. They would then vigorously resist a defense by the tort-feasor that the child was unwanted by his parents since they sought and recovered damages for his birth. At a time when courts and the justice system are being criticized for endeavoring to remedy every perceived wrong by dollars and cents and a litigious public is rushing to the courts for every new and different disappointment and irritation, the majority's recognition of a cause of action for wrongful pregnancy is indeed unfortunate. As stated by the New York Supreme Court, Appellate Division, in *Weintraub v. Brown,* 98 A.D.2d 339, 348–49, 470 N.Y.S.2d 634, 641 (1984), a holding that the birth of a healthy, unwanted child was an injury to the parents

> would be incompatible with contemporary views concerning one of life's most precious gifts—the birth of a normal and healthy child. We are loath to adopt a rule, the primary effect of which is to encourage, indeed reward, the parents' disparagement or outright denial of the value of their child's life.

When a healthy but unplanned child is born to parents, not due to a physician's negligence in any way but due to the parents' own negligence in not preventing conception, no one has thought that the parents were "damaged" or had been "wronged." True, the unexpected birth may cause some financial strain, some hardship on the parents, and an adjustment in their lifestyle for a few years. But when a physician's negligence and his malpractice insurance carrier are added to the equation, everything is changed. "Damage" is suddenly present, and the courthouse is rushed to for a remedy to this new "wrong."

I would not recognize a cause of action in tort, but would, as did the Nevada court in *Szekeres* let a plaintiff recover in contract the costs of medical, surgical, and hospital care associated with the failed surgery. I would not, however, allow the recovery of damages for "the physical and mental pain and damages suffered by the mother as a result of the pregnancy and subsequent childbirth ... and during a reasonable recovery period thereafter; wages necessarily lost by the mother and/or the father of the child because of the pregnancy, childbirth and postnatal recovery; and punitive damages if applicable." Even Mrs. Stratton, the plaintiff here, does not seek lost wages of her husband or punitive damages. I agree with the position taken by Justice Russell in his dissenting opinion in *Miller v. Johnson,* 231 Va. 177, 188–89, 343 S.E.2d 301, 307–08 (1986), that these items of damages, if they are to be recoverable, should be offset against the benefits of parenthood. The majority rejects damages for the rearing of the child because they could only be determined by speculation and conjecture and yet allows, without opportunity for diminution, damages against which there are offsetting benefits. Justice Miller wrote, in part:

> In the final paragraph of the majority opinion, the court notes the futility of

requiring juries to weigh the burdens of parenthood against the joys and benefits arising from a child's life. The majority opinion rejects the plaintiffs' claims for damages for the expenses of rearing their children to maturity because a balance between the burdens and the offsetting benefits of parenthood could only be reached by speculation and conjecture. I fully agree.

Yet the majority, illogically it seems to me, permits recovery for medical expenses, pain, suffering, lost wages, and emotional distress arising from the defendant physicians' failure to prevent the birth of healthy, normal children. Are these "injuries" not to be offset by the pleasures and benefits of parenthood? The thought that a balance exists between the burdens of childbirth and the joy of motherhood is hardly new. [citing John 16:21]

If there are benefits resulting to parents from the birth of healthy, normal children, as the majority evidently believes, why should the defendants not be entitled to an offset for such benefits against the plaintiffs' claimed damages arising from childbirth, just as they would be entitled to offset them against the expense of rearing the children to maturity? The majority rejects the latter as too speculative and conjectural for the fact-finding process. Yet pain, suffering, and mental anguish, which the majority permits, are more subjective and less susceptible of precise calculation than the actual expenses of rearing children. In my view, damages for the claimed plaintiffs' injuries resulting from the birth of healthy, normal children should be disallowed for the same reason the majority disallows damages for the expense of rearing children to maturity.

In summary, I would allow recovery, on the theory of breach of contract, of only medical expenses of the failed sterilization procedure.